**John W. BARNARD & June W. Barnard, Earl D. Kay, Jr. & Nancy O. Kay, Joseph J. Allen & Jennene S. Allen, Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellee.**

No. 83–1777.

United States Court of Appeals, Fourth Circuit.

Submitted March 2, 1984.

Decided April 5, 1984.

John D. Houston, II, Roger G. Rulong, Jr., Michael J. Dempster, Houston, Cohen, Harbaugh & Lippard, Pittsburgh, Pa., on brief, for appellants.

Glenn L. Archer, Jr., Asst. Atty. Gen., Michael L. Paup, Ann Belanger Durney, Bruce R. Ellisen, Tax Division, Dept. of Justice, Washington, D.C., on brief, for appellee.

Before WIDENER, MURNAGHAN and ERVIN, Circuit Judges.

MURNAGHAN, Circuit Judge:

Sixteen taxpayers (individuals or husband and wife) [1] involved in the same transactions designed to provide them with income "tax shelters" found their cases consolidated before the United States Tax Court. In a comprehensive opinion filed May 18, 1983, Judge Arthur L. Nims, III upheld the assessments of income tax deficiencies for the years involved (1975, 1976 and 1977) in the case of each of the taxpayers. *Fox, et al. v. Commissioner of Inter-*

---

1. Stuart I. Fox, Gerald J. Roncolato and Pauline H. Roncolato, Michael J. Aranson and Patti J. Aranson, Robert S. Markovitz and Adele B. Markovitz, William P. Kratsa, Richard J. Leffel and Marsha Leffel, Gerald E. Feldman and Anita T. Feldman, Mervin S. Stewart and Marcia Stew-

art, Howard J. Hook and Sarah E. Hook, Reuben Zemel and Aida Zemel, John W. Barnard and June W. Barnard, Earl D. Kay, Jr. and Nancy O. Kay, Joseph J. Allen and Jennene S. Allen, Ronald I. Dozoretz and Marilyn B. Dozoretz, Walter A. Gunkler, and Stanley Rosenblatt.

*nal Revenue*, 80 T.C. 972 (1983). Three, John W. Barnard and June W. Barnard, Earl D. Kay, Jr. and Nancy O. Kay, and Joseph J. Allen and Jennene Allen took appeals to this Court which were heard, and now are disposed of, on a consolidated basis.

While the facts are complicated, resolution is easy. Judge Nims convincingly demonstrated that a partnership created ostensibly to purchase and market a book manuscript was not engaged in an activity for profit. He further established that a nonrecourse note given by the partnership was not a genuine liability.

Appeals by Stuart I. Fox and by Gerald J. Roncolato and Pauline H. Roncolato were, on the basis of their residences, lodged in the United States Court of Appeals for the Second Circuit. In an opinion filed January 23, 1984, that Court affirmed the decision of the United States Tax Court, stating:

1. Appellants argue that the United States Tax Court erred in disallowing certain deductions in appellants' 1976 and 1977 tax returns. We affirm the decision of the Tax Court, substantially for the reasons set out by Judge Nims in his opinion dated May 18, 1983.

2. We have considered all of appellants' arguments and find them without merit.

3. The decision of the Tax Court is affirmed.

*Fox v. Commissioner of Internal Revenue*, No. 83–4151 (2d Cir. Jan. 24, 1984) (unpublished). We agree with the result and reasoning of the opinion of the Second Circuit Court of Appeals.

Summarily, the tax-minimizing scheme, an evasion not a mere avoidance of tax liability, was structured so that, if not a single copy of the book were ever marketed, nevertheless, the "deductions" generated for income tax purposes would, for high bracket taxpayers which the Barnards, Kays and Allens were, be so great that they would, if the fabricated "deductions" were allowed, reduce taxes by a substantially greater amount than the relatively small sums contributed in cash to the partnership by each taxpayer. The purchase of the book was made through issuance by the partnership of a non-recourse promissory note for $495,000.00 and a cash payment of $163,000.[2] The non-recourse characteristic of the note was for the benefit of the general partner and all of the limited partners.

Since the cash contributed was less than 25% of the total "purchase price," on a *pro rata* allocation of the deduction for the "indebtedness" represented by the non-tax-paying partnership's non-recourse note, each taxpayer picked up a "deduction" three times as great as his or their actual contribution in cash. The taxpayers made no other contributions. A fifty percent bracket taxpayer, consequently, deducted on his income tax returns an amount four times the actual contribution made in cash. Accordingly, the direct tax benefit, even if the book were a total bust, selling not so much as a single copy, was an amount two times greater than the only economic asset, the cash, actually put up. It was a paradigmatic case of how to win by losing. Putting up cash of $9,000, a taxpayer generated a "deduction" of approximately $36,000. The tax savings, accordingly, amounted to $18,000, bringing the taxpayer out way ahead, no matter what.

There was, however, a risk that something might go wrong: the book might actually sell. It would have taken the astronomical number of sales of between 800,000 and 1,300,000 copies, depending on the mix of hard cover and paperback sales as well as other factors, even to reach the point at which the non-recourse note could be paid off and retired. But, along the way, if something were not done, each sale

---

**2.** It appears that originally the aggregate cash contribution was planned to be $165,000, since a) that sum, together with the principal amount of the non-recourse note would equal the agreed on purchase price for the book manuscript of $660,000, and b) the cash contribution would then amount to exactly 25% of the purchase price, *i.e.,* would be one-third as large as the principal of the non-recourse note.

of a copy of the book might reduce the "deductible loss" by the amount of the net proceeds of any sale. To preclude the situation's developing into one where the taxpayers, as partners, might lose through winning, the arrangement was so structured that ½ of the net proceeds of all book sales would be paid to the partners *pro rata*, the other ½ to the partnership for reduction of the outstanding amount due on the non-recourse note. On that basis, a partner would recapture a portion of his or their cash contribution just equal (after taxes) in amount to the economic worth of the diminution in "deduction" resulting from the sale. So sales, while they practically would not help, were treated so they would not hinder, insofar as the availability of the deduction, was concerned.

In short, the partnership's only purpose, as a practical matter, was the development of losses to be deducted for income tax purposes, not the marketing of the book. The partnership was not honestly engaged in an activity for profit. The non-recourse note was not a genuine liability.

It is instructive to reflect on the carefully fashioned, altogether merited observations of Judge Nims. He wrote in his opinion of May 18, 1983:

1. Was the "acquisition of book publishing rights ... a sham, serving no business purpose and lacking any economic substance ...?" (The answer, he concluded, was in the affirmative.)

2. "The price was hardly arrived at through arm's length bargaining. The negotiators on behalf of J.W. Associates (the partnership) had little or no incentive to keep down the cost...."

3. "Romero, J.W. Associate's figurehead general partner, equally received, through Laurel, the benefit of any inflated price and so had no motive to reject on behalf of the partnership any excessive expenditure."

4. "[W]e find [one aspect of the negotiations] tainted with the pervasive disingenuousness characteristic of the entire series of transactions in this case. As long as the nonrecourse note was sufficiently large in comparison to the cash portion of the purchase price such as to achieve anticipated tax benefits, such benefits would make the limited partners essentially unconcerned about the nominal aggregate purchase price."

5. "The record is devoid of evidence showing that the purchase price for the book paid by J.W. Associates to Laurel was in any way determined with a 'true regard for the profitability of the activity.' "

6. "Whether the book's revenues could actually bear the burden of such a purchase price was of no apparent concern to the parties."

7. "The substance of these letters, totally acquiesced in by the petitioners for all that appears in the record before us, are tantamount to admissions by petitioners that unwarranted tax deductions solely motivated their participation in the J.W. Associates partnership."

8. "This arrangement makes no sense from a business point of view ...."

9. "[T]he publication of the book was not conducted with an actual and honest profit objective."

The long and the short of it all is that the parties demeaned themselves in entering so dishonest a venture, unquestionably structured to garner for each of the taxpayers tax advantages to which they were not entitled and devoid of any realistic business purpose. In this case we confront only risk-takers who believed they proceeded on a no-loss path;[3] if they got away with it, well and good from their misguided point of view, and, if they did not, they would be no worse off than had they never sought the unjustified benefits in the first place. We refrain from any expression of opinion as to whether the taxpayers have exposed

---

3. Counsel fees expended in their unsuccessful attempt to take unwarranted advantage of the federal fisc, and hence, of every other American taxpayer, are a secondary, and comparatively trivial, "loss," itself presumably deductible for income tax purposes. *See* 26 U.S.C. § 212(3).

themselves to the risk of criminal prosecution.[4] However, even assuming that perhaps they have not, they, by their conduct, nevertheless reveal a malaise which a healthy United States of America cannot sanction. It is a frightening prospect when our wealthy citizens, those in the highest income tax brackets, seek to take indefensible advantage of the country and their fellow citizens, especially those who have far less from which to meet their tax responsibilities.

Accordingly, the decision of the Tax Court is

AFFIRMED.

---

**4.** *See,* however, 26 U.S.C. § 7201:

Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $100,000 ($500,000 in the case of a corporation), or imprisoned not more than 5 years, or both, together with the costs of prosecution.