JOHN R. DEAN AND FLORENCE DEAN, PETITIONERS V. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 22565–80.     Filed July 19, 1984.

*Marvin S. Lieber, Charles B. Gibbons,* and *Harry F. Klodowski, Jr.,* for the petitioners.

*Francis J. Emmons* and *Robert B. Marino,* for the respondent.

FEATHERSTON, *Judge*: This case was assigned to and heard by Special Trial Judge John J. Pajak, pursuant to the provisions of section 7456(c) of the Code and Rules 180 and 181.[1] The Court agrees with and adopts the Special Trial Judge's opinion which is set forth below.

### OPINION OF THE SPECIAL TRIAL JUDGE

PAJAK, *Special Trial Judge*: Respondent determined deficiencies in petitioners' Federal income taxes for 1976 and 1977 in the amounts of $9,042 and $4,051, respectively. Respondent disallowed the distributable share of losses from a limited partnership, The Season Co., claimed on petitioners' returns.

The issues for decision are: (1) Whether the partnership was engaged in for profit; (2) whether the partnership may deduct interest on certain nonrecourse indebtedness; (3) whether the partnership was a sham organized to create artificial tax deductions; (4) whether the nonrecourse indebtedness should be included in the bases of the partnership and the partners; (5) whether the partnership properly depreciated rights in an original paperback book, "The Season"; (6) whether the partnership was entitled to deduct various miscellaneous items under either section 162 or section 212; and (7) whether the agreement between the partnership and Pinnacle Books, Inc., constituted a sale of the partnership's interest in the manuscript or a "lease of section 1245 property" within the meaning of section 465(c)(1)(C).[2]

This case is one of two groups of cases which were heard pursuant to test case procedures for purposes of judicial

---

[1] All section references are to the Internal Revenue Code of 1954 in effect during the taxable years in question unless otherwise indicated. All references to a Rule are to the Tax Court Rules of Practice and Procedure.

[2] Although petitioners raised an income averaging issue for 1976 in their petition, this issue was not raised at trial or on brief and we deem it conceded by petitioners.

economy of benefit to petitioners, respondent, and the Court. For the same reason, since most of the witnesses had testimony relevant to each of the groups, the test cases of Fuchs, docket No. 18961–81, and Genstein, docket No. 18962–81, both decided this day in *Fuchs v. Commissioner*, 83 T.C. 79 (1984), were consolidated for trial at the same special session of the Court as was this case. The *Fuchs* case pertains to a limited partnership involving "The Chinese Ultimatum" original paperback book and rights thereto. This case pertains to a limited partnership involving "The Season" original paperback book and rights thereto.[3]

## FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.

Petitioners John R. Dean and Florence Dean resided in Wexford, PA, when their petition was filed. On their 1976 and 1977 Federal income tax returns, petitioners deducted losses of $16,501 and $7,408, respectively, in connection with The Season Co. (Season Co.), a limited partnership formed under the laws of Pennsylvania. Respondent disallowed these loss deductions.

---

[3]As noted above, by agreement of the parties, this case is a test case for certain other cases with respect to all issues relating to the adjustment regarding "The Season Limited Partnership." The parties have stipulated that they will be bound by the final decision in this case on those issues. The petitioners and docket numbers of those cases are: Gaetano Dentici, docket No. 7235–81; Stephen J. Takach and Irene Takach, docket No. 14465–81; William C. Vernocy and M. Irene Vernocy, docket No. 19636–81; S. Dale Kinnan and Natalie Kinnan, docket No. 19637–81; Myron Friedlander and Bernice Friedlander, docket No. 19638–81; Allen J. Cousin and Winnie A. Cousin, docket No. 20631–81; John R. Dean and Florence Dean, docket No. 16447–82; Noralco Corp., docket No. 20578–82; Louis D. Pappan and Panagiota L. Pappan, docket No. 23502–82; and Myron Friedlander and Bernice Friedlander, docket No. 29147–82.

By stipulation, the cases listed in this paragraph are some of the cases bound on the statute of limitations issue by the final decisions in the test cases of Bridges, docket No. 14292–81, and Wood, docket No. 14294–81, in which we issued an opinion entitled *Bridges v. Commissioner*, T.C. Memo. 1983–763: Myron Friedlander and Bernice Friedlander, docket No. 19638–81; Noralco Corp., docket No. 20578–82; and Myron Friedlander and Bernice Friedlander, docket No. 29147–82.

Since other issues remain in some of the cases which are, not automatically resolved by resolution of the statute-of-limitations issue in *Bridges v. Commissioner, supra,* and/or of "The Season Limited Partnership" issues in this case, the following cases will be restored to the general docket for resolution of those other issues: Gaetano Dentici, docket No. 7235–81; Allen J. Cousin and Winnie A. Cousin, docket No. 20631–81; Louis D. Pappan and Panagiota L. Pappan, docket No. 23502–82; and Noralco Corp., docket No. 20578–82.

### *"The Season"; an Original Paperback Book*

Patricia Hornung (Hornung) was the former spouse of Paul Hornung, the star halfback of the Vince Lombardi Green Bay Packers. Apparently in 1975, she contacted Robin Moore (Moore) to seek assistance in writing a book about professional football as seen through the eyes of the wives and girlfriends of the players. Moore is the author or coauthor of such best selling books as "The Green Berets," "The French Connection" (coauthor), and "The Happy Hooker" (coauthor), all three of which became highly successful motion pictures. Moore often used coauthors or ghostwriters to write books. Moore contacted Howard Liss (Liss) for his opinion and assistance. Liss is a professional writer who was the ghostwriter of several books for Moore.

Liss found Hornung's initial draft unpublishable. Liss and Hornung met in the summer of 1975 so that Liss could write an original paperback book, "The Season." Liss kept Hornung and Moore apprised of the progress being made on the draft, provided them with copies of work completed, and discussed with Moore future work on the paperback book. Moore did little, if any, of the actual writing. The cover of "The Season" lists as authors "Patricia Hornung & Robin Moore."

During early 1976, Liss accompanied Moore to the office of Jack Klein (Klein), Moore's accountant, where a discussion occurred involving tax shelters. In February 1976, Moore contacted Liss and requested that Liss complete the book as fast as he could do so. Liss finished the book in about 2 weeks and gave it to Moore toward the end of February 1976.

Moore had copyrighted 14 books in the 5 years 1971 through 1975. "The Season" was one of 24 books subject to copyright in Moore's name in 1976. Many more books were subject to copyright under Moore's name in subsequent years.

### *Babbitt Tax Shelter Department*

Babbitt, Meyers & Co. (Babbitt) was a regional member firm of the New York Stock Exchange, with its headquarters in Pittsburgh, PA, and with branch offices located throughout western Pennsylvania. During 1976, Robert E. Rose (Rose) was the manager of Babbitt's tax shelter department. His function

was to seek out, review, and coordinate the distribution of tax-advantaged investments to Babbitt's customers.

Babbitt's practice was to enter into an agreement on behalf of a partnership to be formed. If the offering was successful, the legal formalities of organizing a partnership were followed.

In late 1975 or early 1976, Babbitt began the development of tax shelter programs using books. Since neither Rose nor anyone else at Babbitt had any expertise in the publishing industry, Rose discussed the development of this program with George Mack (Mack) and others. Mack introduced Babbitt to the law firm of Regan, Goldfarb, Heller, Wetzler & Quinn (Regan Goldfarb), New York, NY. Marty Heller of Regan Goldfarb represented Moore. Heller introduced Rose to Moore in January or February 1976. Babbitt used Regan Goldfarb in developing book tax shelter programs. In 1976, Babbitt syndicated at least three limited partnerships which utilized paperback books bearing the name of Moore and different coauthors.

### *Season Co. Private Placement Memorandum*

Babbitt offered $200,000 of limited partnership interests in the Season Co. by a private placement memorandum dated March 2, 1976. The Season Co. was established in the manner described in this memorandum. The memorandum stated in pertinent part that:

THIS INVESTMENT IS AVAILABLE ONLY TO THOSE OFFEREES WHOSE NET WORTH EXCLUSIVE OF HOME AND PERSONAL EFFECTS IS AT LEAST $200,000 OR SOME PORTION OF WHOSE CURRENT ANNUAL GROSS INCOME WOULD BE SUBJECT TO FEDERAL INCOME TAX AT A RATE OF 50% OR HIGHER AND WHOSE NET WORTH IS $100,000 OR MORE. * * *

*Offering*: $200,000 of Limited Partnership Interests to be offered by Babbitt, Meyers & Co. as exclusive agent for the Partnership; 25 Limited Partnership Interests of $8,000 each. Minimum purchase is one Limited Partnership Interest [which] requires (i) the payment of $2,000 in cash at the time of subscription, and (ii) the execution of a negotiable promissory note in the principal amount of $6,000 due in installments on September 1, 1976 and January 31, 1977. * * *

*Partnership Business*: The acquisition, publication and other exploitation of the copyright to and the manuscript entitled THE SEASON written by

ROBIN MOORE with PATRICIA (MRS. PAUL) HORNUNG ("THE WORK") * * *

*Compensation to General Partner*: The General Partner will be paid a guaranteed initial management fee of $2,000 in 1977 which he will contribute to the capital of the Partnership. * * *

> \* \* \* \* \* \* \*

*Purchase Price and Leverage*: The Partnership will purchase the Work for $877,500, of which an aggregate of $135,000 is payable in cash and a short-term nonrecourse promissory note and the balance of $742,500 by delivery of the Partnership's 7-year, 8% nonrecourse purchase money note with required prepayments (i) to December 31, 1976 out of 100% of Partnership receipts attributable to the publication or other exploitation of the copyright and the Work associated therewith after the first $2,000 of such Partnership receipts to pay accrued interest to December 31, 1976 and out of 50% of Partnership receipts in excess thereof to pay principal on the Partnership's 7-year nonrecourse note, (ii) from January 1, 1977 to March 31, 1977 (assuming a closing on April 1, 1977) out of 100% of such Partnership receipts to the extent of accrued interest on such 7-year nonrecourse note for such period and out of 50% of such Partnership receipts to pay principal on such note and (iii) thereafter out of 50% of such Partnership receipts to be applied first to the payment of interest on such 7-year nonrecourse note and then to the principal thereof. In addition, the Partnership may prepay interest in the amount of $5,050 * * *

> \* \* \* \* \* \* \*

*Application of proceeds:*

| | |
|---|---|
| Gross proceeds | $200,000 |
| Less selling commissions | 30,000 |
| Amount available for partnership | 170,000 |
| Cash payment for work | 135,000 |
| Guaranteed management fee | 2,000 |
| Legal fee | 25,000 |
| Accounting fee | 2,000 |
| Interest on 6% nonrecourse note | 5,050 |
| Working capital | 950 |
| Total application of proceeds | $200,000 |

> \* \* \* \* \* \* \*

The Partnership will secure its short-term nonrecourse promissory note in the amount of $110,000 due in installments on September 1, 1976 and January 31, 1977 to be delivered to the seller of the Work, by all of the investors' negotiable promissory notes. In addition, the Seller shall be granted a security interest in the Work as collateral for the due payment of the Partnership's short-term and long-term nonrecourse notes. Thus, if any one investor should fail to pay the Partnership the full amount of his Note so that the Partnership shall be unable to pay its short-term note to the seller

of the Work, the copyright and the Work shall revert to the Seller. Such a reversion would constitute a disposition of the Work by the Partnership and would have a materially adverse effect on the Partnership including materially adverse tax consequences on the investors.* * *

\* \* \* \* \* \* \*

Babbitt, Meyers & Co. * * * as exclusive agent for the Partnership, * * * will receive aggregate commissions of $30,000.

\* \* \* \* \* \* \*

In any event, only a small percentage of all literary properties result in sales sufficient to return a profit * * * there is a substantial degree of risk that exploitation of the Work will not yield profits to the Partnership and the Limited Partners, and that investors may not recoup * * * their capital contributions * * *

\* \* \* \* \* \* \*

The ultimate commercial success of the Work's publication will depend in large part on the quality of the Publisher of the Work and its ability to obtain sufficient retail shelf space * * *

\* \* \* \* \* \* \*

the Publisher would be required to effect sales of approximately 1,700,000 copies of the Work for the royalties payable to the Partnership to be sufficient for the Limited Partners to recover their capital contributions and approximately 5,640,000 copies for the royalties payable to the Partnership to be sufficient to pay the principal and related interest on the Partnership's 8% nonrecourse purchase money note in the amount of $742,500.[4] For the year ended December 31, 1975, approximately ten literary properties were published as paperback originals of which approximately four sold 1,000,000 copies and one sold 2,000,000 copies or more and none of which sold more than 5,000,000 copies.

\* \* \* \* \* \* \*

The Partnership and its publisher will be in competition with numerous other literary property owners and publishers which have substantial financial resources, large distribution staffs and long established histories of publication of paperback originals, none of which may be possessed by the Partnership or its publisher.

\* \* \* \* \* \* \*

---

[4] These projections are based on a 15-percent royalty on a sales price of $1.95 per copy.

William F. Aull, Jr., the General Partner, * * * has had no prior experience as an investor or otherwise in ventures created to exploit literary properties such as the Work.

The synopsis of the work to be purchased entailed 5½ lines in the private placement memorandum.

At least 32 of the 62 numbered pages of the private placement memorandum were devoted to the tax aspect of the transaction. In addition, Exhibit A contained 12 pages of tax projections and Exhibit C was a 47-page legal opinion about Federal income tax consequences.

The private placement memorandum contained a number of schedules entitled "PROJECTED NET AFTER TAX BENEFIT PER INVESTMENT UNIT." Those were based upon payments of $4,000 in 1976 and of another $4,000 in 1977 and were listed in a column captioned "Investment." These schedules included data as shown on page 64.

### Petitioner's Subscription of Interest in Season Co.

Babbitt solicited petitioner John R. Dean (petitioner) and others to purchase interests in Season Co. After receipt of the private placement memorandum, petitioner signed a document captioned "SUBSCRIPTION AGREEMENT AND INVESTMENT LETTER." In that letter, he agreed to make a $2,000 downpayment to the Season Co.'s escrow account, to execute a promissory note in the amount of $6,000 due in installments on September 1, 1976, and January 31, 1977, and to deliver executed copies of the Certification Signature Page. On March 10, 1976, petitioner executed a document captioned "CERTIFICATION SIGNATURE PAGE." Apparently on the same day, petitioner executed the $6,000 promissory note and paid $2,000 to Babbitt by a check dated March 8, 1976.

Petitioner also executed a private placement questionnaire, which referred to his "participation in tax shelter offerings," and stated that his net worth was at least $200,000, his annual income was at least $50,000, and he was in a Federal income tax bracket of at least 50 percent.

Petitioner made two other payments, a $2,000 check dated August 23, 1976, and a $4,000 check dated January, 8, 1977, to Babbitt to acquire a 3.96-percent interest in Season Co.

| Projected copies sold | Year | Investment | Taxable income or (loss) | Tax savings (detriment) at 50% bracket | Cash-flow | Net after-tax benefit (detriment) from investment | |
|---|---|---|---|---|---|---|---|
| | | | | | | Current | Cumulative |
| 68,375 | 1976 | $4,000 | ($16,268) | $8,134 | 0 | $4,134 | $4,134 |
| (minimal revenue) | 1977 | 4,000 | (15,461) | 7,732 | $33 | 3,765 | 7,899 |
| | 1978 | 0 | (1,082) | 541 | 7 | 548 | 8,447 |
| | 1979 | 0 | (756) | 378 | 8 | 386 | 8,833 |
| | 1980 | 0 | (755) | 377 | 8 | 385 | 9,218 |
| | 1981 | 0 | (755) | 378 | 8 | 386 | 9,604 |
| | 1982 | 0 | (755) | 377 | 8 | 385 | 9,989 |
| | 1983 | 0 | 29,177 | (14,589) | 8 | (14,581) | (4,592) |
| Totals | | 8,000 | (6,655) | 3,328 | 80 | | |
| 1,710,000 | 1976 | 4,000 | (9,401) | 4,701 | 3,138 | 3,839 | 3,839 |
| (number needed to | 1977 | 4,000 | (8,816) | 4,408 | 4,335 | 4,743 | 8,582 |
| cover cash payments | 1978 | 0 | (911) | 455 | 178 | 633 | 9,215 |
| made by partners) | 1979 | 0 | (565) | 283 | 198 | 481 | 9,696 |
| | 1980 | 0 | (565) | 282 | 198 | 480 | 10,176 |
| | 1981 | 0 | (565) | 283 | 198 | 481 | 10,657 |
| | 1982 | 0 | (565) | 282 | 198 | 480 | 11,137 |
| | 1983 | 0 | 23,293 | (11,647) | 198 | (11,449) | (312) |
| Totals | | 8,000 | 1,905 | (953) | 8,641 | | |
| 5,640,000 | 1976 | 4,000 | 11,092 | (5,546) | 13,384 | 3,838 | 3,838 |
| (number needed to | 1977 | 4,000 | 11,886 | (5,943) | 14,272 | 4,329 | 8,167 |
| cover Season Co.'s | 1978 | 0 | (98) | 49 | 588 | 637 | 8,804 |
| $742,500 nonre- | 1979 | 0 | 454 | (227) | 738 | 511 | 9,315 |
| course note) | 1980 | 0 | 454 | (227) | 738 | 511 | 9,826 |
| | 1981 | 0 | 454 | (227) | 738 | 511 | 10,337 |
| | 1982 | 0 | 453 | (227) | 738 | 511 | 10,848 |
| | 1983 | 0 | 1,073 | (536) | 1,307 | 711 | 11,619 |
| Totals | | 8,000 | 25,768 | (12,884) | 32,503 | | |

*Season Co.*

The Season Co. was formed by Babbitt in the manner described in the private placement memorandum.

One of the persons interested in "The Season" transaction was Moore. In December 1975, Klein, acting on behalf of Moore, asked Jack Letheren (Letheren) to serve as a consultant on a project. Moore and Letheren had at least one prior business dealing since Moore, Letheren, and another person were to share in sums due in connection with the publication of a book entitled "Valency Girl."

On March 18, 1976, a filing was made with the Pennsylvania Securities Commission pursuant to section 203(d) of the Pennsylvania Securities Act of 1972 regarding Season Co. in which it was stated that Monte E. Wetzler of Regan Goldfarb was the counsel of the issuer and the person to whom correspondence regarding the filing should be sent.

Moore hired Letheren to prepare a narrative report captioned "Current Practices and Conditions in the Paperback Industry" and to obtain three appraisals for "The Season." The narrative report, dated April 7, 1976, was sent to Rose at Babbitt. Rose had Letheren give a preliminary appraisal of "The Season" based on an outline of the book. Letheren's preliminary appraisal showed "The Season" as having a fair market value of 1.1 to 1.2 million dollars.

Babbitt used Regan Goldfarb to prepare a form "endorsement letter" which Letheren forwarded to three appraisers. The appraisers, Jill Hausrath, Herbert J. Moore, and Roger M. Darnio, filled in the blanks. By three separate letters, dated March 19, 1976, addressed to Season Co., each "appraiser" represented in prepared, identical language that "the present fair market value of the work is at least equal to the purchase price of $877,500 plus the contingent payment from release of the motion picture based on the work." Jill Hausrath, Herbert J. Moore, and Letheren were engaged in business together as Jack Letheren & Associates from about 1975 to 1979. Stanley B. Stetzer (petitioner's expert witness) began working with Letheren in 1976.

William F. Aull, Jr. (Aull), was the first general partner of Season Co. He had no experience in the publishing industry. He served as a general partner to facilitate the formation of

the partnership for Babbitt's tax shelter department. Aull did not take part in any transactions relating to the acquisition of "The Season" nor with the publishing company. Aull merely reviewed and signed documents given to him by Rose of Babbitt. The duties and functions of the general partner were handled largely by personnel of Babbitt.

The 1976 Federal partnership return reported that Season Co. commenced business on March 31, 1976. As of that date, a certificate of limited partnership regarding Season Co. was signed by Aull as general partner and Sally Diehl as "nominee, limited partner." Diehl was a Babbitt employee.

Aull resigned as general partner on August 29, 1977, and until March 1979, Season Co. had no formal general partner. In March 1979, Robert C. Arthurs (Arthurs), a general partner of Babbitt, assumed the position of general partner of Season Co. Arthurs sometimes functioned in the guise of BMC Management Corp., a wholly owned subsidiary of Babbitt. During all relevant times, Arthurs managed 20 to 25 tax shelters.

### Acquisition of Rights to "The Season" by Season Co.

Season Co. obtained all of the worldwide rights to "The Season" by two separately executed purchase agreements dated May 19, 1976, one signed by Moore and Hornung as the "Sellers" and the other by Aull as General Partner for Season Co., as the "Purchaser." These rights included motion picture, television, and commercial rights. All payments to sellers were to be made to Klein. Under the agreement, Season Co. was to enter into a contract whereby a publisher would publish "The Season" as a "paperback original" by July 1976, pay Season Co. 15 percent of the cover price of all such paperbacks sold, exclusive of returns, and pay royalties due with respect to sales through October 31, 1976, not later than December 31, 1976.

The agreement provided in part that:

12(a) In consideration of the rights and property sold to Purchaser hereunder, Purchaser agrees to pay to Sellers the sum of Eight Hundred Seventy-Seven Thousand, Five Hundred Dollars ($877,500.00) payable as follows:

(i) The sum of Twenty-Five Thousand Dollars ($25,000.00) at the closing by bank or certified check.

(ii) By delivery to the Sellers at the closing of a nonrecourse promissory note of the Purchaser in the amount of One Hundred Ten Thousand Dollars ($110,000.00) bearing interest at 6% per annum and payable in installments as follows: (a) Eighteen Thousand Dollars ($18,000.00) on September 1, 1976 and (b) Ninety-Two Thousand Dollars ($92,000.00) on January 31, 1977 with all interest due on this note to be paid on January 31, 1977 provided that the Purchaser shall have the right to prepay said interest at any time without penalty.

(iii) The balance of the purchase price by delivery to Sellers at the closing of a non-recourse promissory note (the "Note") of the Purchaser in the amount of Seven Hundred Forty-Two Thousand Five Hundred Dollars ($742,500.00) in the form annexed hereto as Exhibit "A".

(b) As security for the payment of the note referred to in (ii) of paragraph 12(a) above, the Purchaser hereby grants to Sellers a security interest in all of the recourse notes executed by the limited partners of the Purchaser in partial payment of their capital contributions to the limited partnership.
* * *

* * * * * * *

(e) In the event a motion picture is produced based wholly or in part on the Property, then in addition to the above mentioned payments, Purchaser will pay to the Sellers a sum equal to five percent (5%) of Purchaser's share of the gross receipts or net profits of the said motion picture, as the case may be, earned by the said motion picture within two (2) years of the general release of the picture in the United States of America.

* * * * * * *

[(f)(i)] When the [$742,500 nonrecourse] Note becomes due and payable upon maturity, if there remains any unpaid principal amount and accrued interest thereon Sellers shall be entitled to repossess the Property securing the Note and recover legal title thereto and Purchaser shall have no further interest in the Property or the receipts thereof. Sellers shall have no recourse whatsoever against the Purchaser, the Purchaser's other assets or the General or Limited Partners in the event of a default in the payment of the Note.

* * * * * * *

[13(b)] The share of the gross receipts received by Purchaser shall, after making the payments set forth in paragraph 12(e) above, be applied as follows:

(i) From the closing date to and including December 31, 1976 one hundred percent (100%) of such gross receipts in excess of the first Two Thousand Dollars ($2,000.00) will be paid to the Sellers to the extent of interest due on the Note for the period from the closing date to and including December 31, 1976. During the said period from the closing date to and including December 31, 1976 fifty percent (50%) of the balance of such gross receipts in excess of the said sum of Two Thousand Dollars ($2,000.00) and all of the

foregoing interest paid to Sellers shall be paid to Sellers in reduction of the principal of the Note and fifty percent (50%) of such gross receipts shall be retained by the Purchaser.

(ii) From January 1, 1977 through and including a date occurring one year after the closing date, one hundred percent (100%) of the gross receipts shall be paid to the Sellers to the extent of interest due on the Note for such period and previously accrued but unpaid interest. After all such interest has been paid to the Sellers, fifty percent (50%) of gross receipts shall be paid to Sellers and fifty percent (50%) of such gross receipts shall be retained by the Purchaser, it being agreed that any such payments to Sellers shall be deemed first credited to interest and then to principal. Purchaser shall make such payments to Sellers of Sellers' share of the gross receipts (as set forth in subdivision (i) of this subparagraph (b)) on July 1 and December 1 of each year in respect of all receipts received during such periods commencing with the first publication of the Property. * * *[5]

\* \* \* \* \* \* \*

20. * * * the sellers have agreed to pay to George Mack in consideration of Mr. Mack introducing the Sellers to the Purchaser a finder's fee in the amount of Thirty-Five Thousand Dollars ($35,000.00) * * *

The $742,500 figure for the nonrecourse note was derived by multiplying 5.5 times the $135,000 cash payment. This formula was used by Babbitt with respect to a number of books bearing Moore's name involved in limited partnerships syndicated by Babbitt.

Two nonrecourse promissory notes payable to Moore and Hornung, dated May 19, 1976, were executed by Aull on behalf of the Season Co. as part of the closing. The first note was for $110,000 payable in installments of $18,000 and $92,000 on September 1, 1976, and January 31, 1977, respectively, together with interest at 6 percent per annum on the unpaid balance due on January 31, 1977. Under the agreement, this note was secured by the recourse notes of the limited partners. This note was paid to Moore and Hornung in accordance with its terms, including $3,886.68 as interest.

---

[5]By its terms, the nonrecourse note was payable solely out of gross receipts as defined in par. 13 of the May 19, 1976, agreement. We note that the provisions of par. 13(b)(ii) of that agreement set forth above differ somewhat from those in the private placement memorandum set forth above under the heading *Purchase Price and Leverage*. The parties to the agreement apparently misunderstood the agreement and the memorandum as to the requirement for complete payment of accrued interest for the period beginning Jan. 1, 1977. On Dec. 29, 1980, Arthurs wrote to Frank Sturges, an agent of Moore, stating that: "Per the sales agreement and the offering memorandum we were to retain the first $2,000.00, pay the authors 100 percent of all revenues to April 30, 1977, and then 50 percent of any revenues beyond that point."

The second nonrecourse note for $742,500 was due on May 19, 1983, with interest at 8 percent on the balance outstanding. In 1977, Season Co. paid Moore and Hornung $37,311.10, of which $36,678.69 was applied to interest due on this note for the period May 19, 1976, through December 31, 1976, and $632.41 was applied against principal. In 1978, Season Co. paid Moore and Hornung $11,100.11 against interest due and in 1980 paid them $5,126.89 against interest due. Over almost the full 7-year period, Season Co. paid a total of $52,905.69 against the approximately $415,500 of interest accrued on the second note and $632.41 against the $742,500 principal.

### The Publisher and Season Co.

Prior to Season Co.'s acquisition of "The Season," Moore had contacted Andrew Ettinger (Ettinger), vice president of Pinnacle Books Inc. (Pinnacle), with respect to several books, including "The Season" and the "The Chinese Ultimatum."

During 1976, Pinnacle was in the bottom third of the 18 mass-market paperback publishers. Pinnacle then held about a 2-percent market share, generated 7 to 8 million dollars in sales, and published at least 144 titles of the approximately 3,000 paperbacks published annually.

Ettinger was willing to publish "The Season," even though two books bearing Moore's name and coauthored by Liss which previously were published by Pinnacle were not successful. These books were "The London Switch," which had final net sales of 37,000, and "The Italian Connection," which had only 20,000 in net sales. Eventually Mack, Rose, and others entered into the discussions with Ettinger about "The Season."

On March 10, 1976, a manuscript of "The Season" was delivered to Pinnacle. On March 17, 1976, an agreement naming Season Co. as the "Author" and Pinnacle as the publisher was signed by Aull on behalf of Season Co. Subsequently, that agreement was signed by Pinnacle. Ultimately, it was redated May 19, 1976, and two inconsequential changes were made.

The agreement provided for a $10,500 advance against all earnings from a 15-percent royalty on the retail price of all original paperback copies sold. Pinnacle paid the $10,500 advance to Season Co. The agreement also included a provision in which Season Co. agreed to share with Pinnacle 10 percent

of the revenues derived from motion picture and television rights. It was not customary in the mass market industry to make royalty payments for the period August 1976 through October 31, 1976, by December 31, 1976. Pinnacle nevertheless agreed to make such payments to Season Co.

Pinnacle promoted "The Season" as an original paperback book to the best of its efforts. Hornung assisted Pinnacle in promoting the book by making publicity tours to 26 cities during August through October 1976.

### Receipts from "The Season"

"The Season" was originally published by Pinnacle in August 1976 with an initial print of 390,000 copies. New cover art was used when 68,561 copies of "The Season" were republished by Pinnacle in September 1977. "The Season" was distributed throughout the United States and Canada by Independent News Co., a wholly owned subsidiary of Warner Communications, Inc. The book also had some export sales and sales to U.S. military posts which were also handled by Independent News. Sales of the German language rights were a minor source of revenue for Season Co.

The most current royalty figures provided by the Pinnacle to Season Co. for sales through June 30, 1982, indicated that 410,459 copies of "The Season" were distributed, with net sales of 196,252 units, a 47.8-percent sale.

The Season Co. also derived revenue from the sales of options to purchase motion picture/television rights to "The Season." During 1977–78, Zeitman Productions of Beverly Hills, CA, paid $7,500 for option rights. In 1980, Jack Haley Jr. Productions, Inc., paid $1,000 for a 3-month option. During 1980–81, Lorimar Productions paid a total of $4,100 for an option and extensions thereof. A total of $12,600 was generated from the sale of these options.

During the years 1976 through June 30, 1982, Season Co. received $58,065.10 in royalties from book sales. Through 1981, $12,600 was received from the sale of television/movie options. These figures total $70,665.10, of which $53,538.10 was paid to Moore and Hornung under the terms of the May 19, 1976, agreement.

## Valuation of "The Season"

An April 8, 1983, valuation report by petitioner's witness, Stanley B. Stetzer (Stetzer), stated that in his opinion based on potential earnings foreseeable in the summer of 1976, the net proceeds from the sale of all rights to "The Season" could reasonably have been expected to be $927,484. An October 27, 1982, valuation report by respondent's witness, Robert Sachs (Sachs), estimated a fair market value for "The Season" as of May 19, 1976, at $16,700. A December 28, 1982, valuation report by respondent's witness, Stephen Conland (Conland), stated that his opinion was that the fair market value of "The Season" as of May 19, 1976, was $2,000. The reports of these three persons indicated the following in comparison to the actual figures:

| | Stetzer | Conland | Sachs | Actual |
|---|---|---|---|---|
| "The Season" paperback | | | | |
| Estimated print | 1,675,000 | 100,000 | none given | 458,561.00 |
| Net sales (copies) | 1,500,800 | 50,000 | 160,000 | 196,252.00 |
| Return percentage (books not sold) | 10.4% | 50%. | none given | 57.2% |
| Value of book | none given | $2,000 | $16,700 | |
| Estimated receipts by Season Co. from rights to "The Season" | | | | |
| Dollar value of royalties | $438,984 | $14,625 | $46,800 | $57,343.52 |
| Book club sales | 55,000 | 0 | 0 | 0 |
| Foreign language receipts | 36,500 | 0 | 0 | 721.58 |
| Serial excerpts receipts | 22,000 | 0 | 0 | 0 |
| Motion picture receipts | 375,000 | 0 | 0 | 12,600.00 |
| Total | 927,484 | 14,625 | 46,800 | 70,665.10 |

On May 16, 1976, net sales of "The Season" would at best be expected to be in the 160,000 to 200,000 range. The value of other rights on that date was so speculative as to be unable to be estimated. On May 16, 1976, estimated receipts from all the rights to "The Season" did not exceed $58,500, and the value of all such rights was significantly less than $58,500. On that date, there was no possibility that Season Co. would generate enough revenues to return petitioners' cash payments and that the $742,500 nonrecourse note would be paid by its due date.

## Season Co.'s Reported Losses

Season Co. was a cash basis taxpayer and filed partnership returns for years ending December 31. For years 1976 through 1978, Season Co. elected the income forecast method of depreciation. Season Co. switched to the straight line method for 1979 and 1980. The partnership returns, Forms 1065, filed with the Internal Revenue Service by Season Co. for 1976 through 1980, reported the following:

|  | 1976 | 1977 | 1978 | 1979 | 1980 |
|---|---|---|---|---|---|
| Gross receipts | $39,944 | $13,655 | $10,098 | 0 | $2,652 |
| Interest income | 0 | 895 | 917 | $1,327 | 1,472 |
| Other income | 250 | 0 | 0 | 0 | 0 |
| Total income | 40,194 | 14,550 | 11,015 | 1,327 | 4,124 |
| Interest expense | 0 | 41,198 | 0 | 0 | 0 |
| Depreciation | 446,374 | 151,980 | 112,845 | 25,214 | 25,214 |
| Amortization | 0 | 6,000 | 0 | 0 | 0 |
| Other deductions | 10,500 | 2,457 | 500 | 4,640 | 1,658 |
| Total deductions | 456,874 | 201,635 | 113,345 | 29,854 | 26,872 |
| Ordinary loss | (416,680) | (187,085) | (102,330) | (28,527) | (22,748) |

Petitioners paid Babbitt $4,000 in 1976 and $4,000 in 1977 for their interest in "The Season." Petitioners deducted partnership losses from Season Co. in 1976 and 1977 in the amounts of $16,501 and $7,408, respectively. Respondent disallowed both deductions.

### OPINION

Petitioners claim Season Co. was engaged in business for profit and that it was entitled to an interest deduction in 1977. Respondent contends, among other things, that Season Co. did not conduct its activities for profit and that it was not entitled to interest deductions on nonrecourse notes.

### I. Section 183

At the outset, we accept the fact that Pinnacle, as the publisher, fully utilized its resources as a small mass-marketing publishing house to sell "The Season." Accordingly, we have not dwelt extensively upon that aspect of this case in our findings of fact. Our inquiry is not directed, as petitioners

would have us believe, to the question of whether Pinnacle did its job. The first critical question before us is whether the partnership, Season Co., was an activity engaged in for profit within the meaning of section 183.[6]

An "activity not engaged in for profit" is defined in section 183(c) as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." If the activity is not engaged in for profit, then section 183(b) separates the claimed deductions into two groups. Section 183(b)(1) allows only those deductions which are not dependent upon a profit objective, e.g., interest and taxes. Section 183(b)(2) allows the balance of the deductions which would otherwise be permitted if the activity was engaged in for profit, but only to the extent that the gross income derived from the activity exceeds the deductions allowed under paragraph (1).

It is well established that: (1) Section 183 is not a disallowance section; (2) section 183 allows a limited partner to take deductions otherwise not allowable where the partnership is not engaged in a trade or business under section 162 or in an activity not encompassed by paragraphs (1) and (2) of section 212; and (3) the question of whether the partnership is "not engaged in for profit" under section 183 is determined at the partnership level. *Fox v. Commissioner*, 80 T.C. 972, 1006 (1983), affd. by order (2d Cir., Jan. 23, 1984), affd. sub nom. *Barnard v. Commissioner*, 731 F.2d 230 (4th Cir. 1984), affd. sub nom. *Kratsa v. Commissioner*, in an unpublished order,

---

[6]Sec. 183 provides in part as follows:

SEC. 183. ACTIVITIES NOT ENGAGED IN FOR PROFIT.

(a) GENERAL RULE.—In the case of an activity engaged in by an individual or an electing small business corporation (as defined in section 1371(b)), if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section.

(b) DEDUCTIONS ALLOWABLE.—In the case of an activity not engaged in for profit to which subsection (a) applies, there shall be allowed—

(1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and

(2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1).

(c) ACTIVITY NOT ENGAGED IN FOR PROFIT DEFINED.—For purposes of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212.

734 F.2d 6 (3d Cir. 1984), affd. sub nom. *Hook v. Commissioner*, in an unpublished order 734 F.2d 5 (3d Cir. 1984);[7] *Brannen v. Commissioner*, 78 T.C. 471, 499–500, 505 (1982), affd. 722 F.2d 695 (11th Cir. 1984); *Siegel v. Commissioner*, 78 T.C. 659, 696–698 (1982). Thus, petitioners' argument that they invested in the Season Co. with a bona fide objective to make a profit is of little significance to our analysis under the instant facts since a limited partner has no control over partnership activities or the business deductions of the partnership. *Brannen v. Commissioner, supra; Fox v. Commissioner, supra; Resnik v. Commissioner*, 66 T.C. 74, 81 (1976), affd. per curiam 555 F.2d 634 (7th Cir. 1977).

Petitioners must show that Season Co. engaged in the exploitation of the rights to "The Season" with the "actual and honest objective of making a profit." *Dreicer v. Commissioner*, 78 T.C. 642, 646 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). While a reasonable expectation of profit is not required, Season Co.'s actual and honest objective of making a profit must be bona fide. *Fox v. Commissioner*, 80 T.C. at 1006. Section 1.183–2(b), Income Tax Regs., lists some of the relevant factors to be considered in determining whether an activity is engaged in for profit.

The issue is one of fact to be resolved not on the basis of any one factor, but on the basis of all the facts and circumstances. *Allen v. Commissioner*, 72 T.C. 28, 34 (1979); *Jasionowski v. Commissioner*, 66 T.C. 312, 321 (1976). Greater weight is given to objective facts than to the parties' mere statement of their intent. *Siegel v. Commissioner, supra* at 699; *Engdahl v. Commissioner*, 72 T.C. 659, 666 (1979).

In determining Season Co.'s intent, we focus on the intent of the general partner and the promoters of Season Co. since it is these individuals who actually controlled the partnership's activities. *Fox v. Commissioner*, 80 T.C. at 1007–1008. In this case, it is clear that Babbitt organized and controlled Season Co. Aull was only a strawman for Babbitt which carried on the duties of the general partner. Eventually Arthurs, a Babbitt employee, formally assumed the mantle of the general partner.

---

[7]An appeal of this case would lie to the Third Circuit.

Based on the record before us, we are convinced that Babbitt organized Season Co. as a limited partnership in order to create artificial losses which the limited partners could use to reduce their taxes. The essence of this transaction was to transfer all rights to "The Season" for 7 years to the partnership for a grossly inflated price in the form of an outright sale, to use the facade of the distribution of an original paperback book via Pinnacle, and to use a grossly exaggerated nonrecourse note to create large tax losses for the limited partners through unwarranted depreciation deductions.

Babbitt attempted to paper as a business activity the formation and operation of Season Co. Some of this paper was specious, as in the case of the three identical appraisals Letheren supplied to Babbitt. Babbitt made sure, contrary to normal publishing practices, that the initial royalties would be paid before December 31, 1976, so that a loss could be claimed in 1976 under the income forecast method of depreciation. See *Siegel v. Commissioner, supra* at 693. In addition, Babbitt puffed up the depreciation deductions by an excessive nonrecourse note which bore no relationship to reality other than that it equaled 5.5 times the cash payments made to Moore and Hornung, the same factor used by Babbitt with respect to a number of books bearing Moore's name.

Petitioners' expert witness so exaggerated his estimates of the value of the rights to "The Season" that his testimony was incredible, i.e., not credible. We found Sachs, one of respondent's expert witnesses, the most impressive in terms of his knowledge of the book business and valuation of the prospects of "The Season" as of May 1976. We are satisfied that on May 19, 1976, it was obvious that at best "The Season" would have modest net sales of 160,000 to 200,000 copies. Net sales of 200,000 copies with a royalty of 29.25 cents per copy would result in $58,500 in income. Most of the other rights were without value and the movie rights were so speculative as to be incapable of being valued. It is obvious that the value of all rights to "The Season" was significantly less than $58,500. We question whether, aside from tax motivations, Season Co., or anyone else in an arm's-length transaction, would agree on a price of $874,500 for a return of $58,500. We are convinced that the Season Co. transactions were not economically sound and lacked a commercial objective.

We can contrast what happened here with what would have happened in a straight economic transaction if Moore and Hornung had contracted directly with Pinnacle. Moore and Hornung would have received a total of about $71,000 over the 7-year period. Instead, via Season Co., Moore and Hornung received approximately $157,000, principally within the first year after publication. The interposition of Season Co. only served to fatten the purses of Moore, Hornung, Babbitt, Regan Goldfarb, and others by offering unwarranted paper losses to limited partners.

The factual sequence can be simplified. Hornung contacted Moore with respect to her rough draft of a concept for a book. Moore had Liss write a book for publication as a paperback original. Moore contacted Pinnacle to have it publish a mass-market paperback original. Pinnacle was willing to sign the requisite documents with a limited partnership.

Moore, Babbitt, Regan Goldfarb, and others engaged in a cooperative effort to set up the tax scheme known as Season Co. The private placement memorandum demonstrates that the sole purpose of Season Co. was to create substantial after-tax benefits in 1976 and 1977 no matter how many book sales actually occurred. Under the facts of this case, the only conclusion that could be drawn in 1976 was that these after-tax benefits would be substantial paper losses used to reduce other income of the limited partners.

Pinnacle published the original paperback after Moore and Hornung purportedly transferred *all* their rights in "The Season" to Season Co. Nevertheless, over 75 percent of the $70,655.10 of royalties and movie option income flowed to Moore and Hornung while these rights were held by Season Co. As anticipated, most of the revenues were derived in the first 2 years.

There was no prospect whatsoever that the $742,500 nonrecourse note would be paid off on or before May 19, 1983. The actual payments made by date of trial, which included nonsubstantial payments against interest due on that nonrecourse note and a de minimis payment against principal, were not such as to lend economic substance to that nonrecourse note.

In summary, based upon the facts in this record, petitioners have failed to sustain their burden of showing that Season Co. was engaged in the exploitation of the rights to "The Season"

for profit. Accordingly, all deductions claimed by petitioners, other than interest expenses in 1977, are allowable only to the extent that gross income exceeds the deductions allowable under section 183(b)(1).

Since there were no section 183(b)(1) deductions in 1976, there was no distributable loss in 1976. Accordingly, respondent's determination is sustained as to 1976.

## II. Section 163

For 1977, Season Co. claimed a total interest deduction of $41,197.78 which included $36,678.69 as interest on the $742,500 nonrecourse note. We agree with respondent that this $36,678.69 was not deductible interest under section 163.[8]

To qualify for a section 163 deduction, the taxpayer must pay for the use or forbearance of money upon a genuine indebtedness. *Autenreith v. Commissioner*, 115 F.2d 856, 858 (3d Cir. 1940), affg. 41 B.T.A. 319 (1940); *Norton v. Commissioner*, 474 F.2d 608, 610 (9th Cir. 1973), affg. a Memorandum Opinion of this Court; *Fox v. Commissioner*, 80 T.C. at 1019–1020. This Court explained in *Fox v. Commissioner*, 80 T.C. at 1019, that "There are various approaches which may be taken in establishing whether a purchaser may treat a nonrecourse liability as a bona fide debt." The approach we follow is the one recently stated in *Flowers v. Commissioner*, 80 T.C. 914, 942 (1983), as follows:

Where both the purchase price and the lesser principal amount of the nonrecourse note which makes up a portion of such purchase price unreasonably exceed the value of the property acquired, then no "genuine indebtedness" exists and no "investment in the property" occurs. *Estate of Franklin v. Commissioner*, 544 F.2d 1045 (9th Cir. 1976), affg. 64 T.C. 752 (1975); *Odend'hal v. Commissioner*, 80 T.C. 588, 604 (1983); *Hager v. Commissioner*, 76 T.C. 759, 788 (1981); *Narver v. Commissioner*, 75 T.C. 53 (1980), affd. per curiam 670 F.2d 855 (9th Cir. 1982); *Beck v. Commissioner*, 74 T.C. 1534 (1980), affd. 678 F.2d 818 (9th Cir. 1982).

Here, too, both the purchase price and the $742,500 nonrecourse note unreasonably exceeded the value of the property

---

[8]Also included in the total claimed deduction was $3,886.68 of interest paid on the $110,000 note. In light of our findings, we deem it unnecessary to consider whether the $3,886.68 is deductible under sec. 163 since it is less than the reported gross income of $14,550. The remaining $632.41 of the total claimed interest deduction is the principal payment made in 1977 on the $742,500 nonrecourse note. Obviously, that is not deductible interest.

acquired.[9]

We have found that on May 16, 1976, the maximum estimated receipts from all rights to "The Season" totaled $58,500 and the value of such rights was substantially less than that amount. We contrast that with the purchase price of $877,500 and the nonrecourse note of $742,500. It is obvious that both the purchase price and the $742,500 nonrecourse obligation were both grossly inflated and far in excess of the value of the rights to "The Season." We have discussed above the tax factors motivating the structuring of the Season Co.'s activities and showing the artificial nature of the $742,500 nonrecourse note. Suffice it to say that that note is not a genuine indebtedness and does not support Season Co.'s claimed interest deduction.[10] Accordingly, there was no distributable loss for 1977 and respondent's determination for that year is sustained.

When we view this case as a whole we can only conclude that the recent statement by the Court of Appeals in *Barnard v. Commissioner*, 731 F.2d 230, 232–233 (4th Cir. 1984), affg. *Fox v. Commissioner, supra*, is apposite:

---

[9]We note that in *Brannen v. Commissioner*, 78 T.C. 471, 493 (1982), affd. 722 F.2d 695 (11th Cir. 1984), this Court stated that the test was whether the stated purchase price unreasonably exceeded the value of the property whereas in *Hager v. Commissioner*, 76 T.C. 759, 773–774 (1981), this Court stated that the test was whether the principal amount of the nonrecourse indebtedness unreasonably exceeded the value of the property. We need not decide which test is appropriate on the facts before us (see *Brannen v. Commissioner*, 78 T.C. at 513–514 (Chabot, J., concurring)), because we find that both the purchase price and the principal amount of the nonrecourse debt unreasonably exceeded the value of the rights to "The Season."

[10]Our conclusion is not changed by the opinion of the Supreme Court in *Commissioner v. Tufts*, 461 U.S. 300 (1983), which held that where a taxpayer disposes of property encumbered by nonrecourse indebtedness in an amount that exceeds the fair market value of the property, the Commissioner may require him to include the outstanding amount of the nonrecourse obligation in the amount realized by him. That case involved the symmetrical treatment to be accorded where nonrecourse liability has been properly included in basis initially and must thereafter also be included in the amount realized on disposition of the encumbered property. The Supreme Court, relying upon the Commissioner's treatment and over 35 years of judicial sanction, held that the nonrecourse loan should be treated as a true debt in that situation.

The instant case does not fit within the context of *Tufts* and *Crane v. Commissioner*, 331 U.S. 1 (1947). Our issue is whether or not the nonrecourse obligation is genuine indebtedness so that it can be properly included in basis at the front-end of the transaction. We have found that it was not genuine indebtedness and could not properly be included in the basis of the rights to "The Season." Our decision is based on the unreasonably and artificially inflated amount of the nonrecourse indebtedness at the outset. That was not the fact in either *Tufts* or *Crane*. *Fox v. Commissioner*, 80 T.C. 972, 1023 n. 25 (1983), affd. by order (2d Cir., Jan. 23, 1984), affd. sub nom. *Barnard v. Commissioner*, 731 F.2d 230 (4th Cir. 1984), affd. sub nom. *Kratsa v. Commissioner*, in an unpublished order, 734 F.2d 6 (3d Cir. 1984), affd. sub nom. *Hook v. Commissioner*, in an unpublished order 734 F.2d 5 (3d Cir. 1984); *Rice's Toyota World, Inc. v. Commissioner*, 81 T.C. 184, 196 n. 9 (1983), on appeal (4th Cir., Feb. 27, 1984).

The long and short of it all is that the parties demeaned themselves in entering so dishonest a venture, unquestionably structured to garner for each of the taxpayers tax advantages to which they were not entitled and devoid of any realistic business purpose. In this case we confront only risk-takers who believed they proceeded on a no-loss path; if they got away with it, well and good from their misguided point of view, and, if they did not, they would be no worse off than had they never sought the unjustified benefits in the first place. We refrain from any expression of opinion as to whether the taxpayers have exposed themselves to the risk of criminal prosecution. However, even assuming that perhaps they have not, they, by their conduct, nevertheless reveal a malaise which a healthy United States of America cannot sanction. It is a frightening prospect when our wealthy citizens, those in the highest income tax brackets, seek to take indefensible advantage of the country and their fellow citizens, especially those who have far less from which to meet their tax responsibilities. [Fn. refs. omitted.]

In light of our disposition of this case, we find it unnecessary to discuss the other arguments raised by respondent in support of the disallowance of petitioners' deductions relating to Season Co.

*Decision will be entered for the respondent.*