JAMES POLAKOF, Et Al., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Polakof v. Commissioner
Docket Nos. 4777-80, 13875-80, 15666-81, 20512-81, 25657-81, 25658-81, 25659-81, 29625-81, 29626-81, 29627-81, 29629-81, 29630-81, 30040-81, 31015-81, 1764-82, 1765-82.
United States Tax Court
T.C. Memo 1985-197; 1985 Tax Ct. Memo LEXIS 438; 49 T.C.M. (CCH) 1300; T.C.M. (RIA) 85197; April 23, 1985. Edward B. Simpson, for the petitioners. Theodore Garelis, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined the following *440 deficiencies in petitioners' Federal income taxes: Petitioner
Docket No.
Year
Deficiency
James P. Polakof
4777-80
1974
$ 2,283.00
1975
$ 534.00
Roy C. Peterson
13875-80
1976
$ 627.00
Clarence H. Steinhebel and
15666-81
1971
$ 1,328.89
Gertrude Steinhebel
1972
$ 1,566.00
1973
$ 606.11
1974
$ 3,261.00
1975
$ 1,273.00
1976
$ 663.00
1977
$ 449.00
Lee E. Schwartz and
20512-81
1973
$ 4,684.00
Vera J. Schwartz
1974
$ 8,065.00
1975
$ 2,513.00
1976
$ 2,661.00
1977
$ 560.00
Michael A. and Sue B.
25657-81
1971
$ 1,565.90
Baker
1972
$ 1,497.00
1973
$ 3,674.00
1974
$ 2,884.00
1975
$ 3,088.00
1976
$ 2,396.00
1977
$ 397.00
Leonard A. Vinci
25658-81
1976
$ 1,415.00
1977
$ 1,776.00
Leonard A. Vinci
25659-81
1973
$ 4,091.00
1974
$ 8,051.00
1975
$16,558.00
Ken B. and Marilyn K.
29625-81
1971
$ 2,075.00
Teakle
1973
$ 3,208.00
1974
$ 880.00
1975
$ 3,216.00
1976
$ 1,147.00
George P. and Ramona T.
29626-81
1974
$ 2,271.90
Golf
1975
$ 553.46
1976
$ 289.44
1977
$ 460.00
Roman J. and Lorraine A.
29627-81
1974
$ 9,864.00
Oleynik
John and June Ferreri
29629-81
1973
$ 1,037.00
1974
$ 1,455.00
1975
$ 3,040.00
1976
$ 856.00
1977
$ 1,478.00
Dean S. Merrick and
29630-81
1973
$ 8,554.00
Marilyn Merrick
1974
$ 8,029.00
1975
$11,857.00
1976
$ 5,623.00
1977
$ 775.00
Francis X. Driscoll and
30040-81
1976
$ 4,647.00
Patricia B. Driscoll
1978
$ 3,089.00
William and Carol Talty
31015-81
1974
$ 4,842.00
1975
$ 1,570.00
1976
$ 507.00
1977
$ 511.00
David and Frances Stevenson
1764-82
1974
$ 2,522.00
1975
$ 1,021.00
1976
$ 362.00
1977
$ 204.00
Arlyn and Sharon Blackwell
1765-82
1973
$ 2,261.39
1974
$ 4,559.00
1975
$ 3,015.00
1976
$ 1,143.00
1977
$ 1,651.00
*441 The tax liabilities in dispute arise from each of the petitioners' involvement in one or more limited partnerships, CFA Investors I, CFA Investors IV, CFA Investors V, and CFA Investors VII. Each of these partnerships acquired and distributed a motion picture and reported losses and investments for tax credit purposes which were passed through to the limited partners. The correctness of respondent's disallowance of these deductions and credits produced the determined deficiencies and turns on the following issues: 1. Whether the partnerships' activities with respect to the motion pictures constituted a trade or business; the answer determines whether petitioners are entitled to deductions for losses attributable to deductions for business expenses and depreciation claimed under sections 162(a)[2] and 167(a) and investment credits under section 38 and related sections which were passed through the partnerships to them for the years 1973, 1974, 1975, and 1976; and 2. Whether nonrecourse notes given by the partnerships as part of the consideration for the motion pictures were genuine indebtedness; the answer determines the allowability of interest deductions claimed by the partnerships *442 and included in the loss deductions passed through to the partners. [3]
FINDINGS OF FACT At the time the petitions in these consolidated cases were filed, all of the petitioners were legal residents of California. Facts Common to All Partnerships
Cinema Financial of America, Inc. (CFA), a California corporation, was the general partner of each of four limited partnerships, designated CFA Investors I, CFA Investors IV, CFA Investors V, and CFA Investors VII. To promote the sale of limited partnership interests, CFA published a prospectus for each partnership *443 entitled "A Private Offering of Limited Partnership Interests." The prospectus on CFA Investors I declares that: The principal objectives of the Partnership are to maximize the distributed return on investors' capital and to provide investors with significant Federal Income Tax deductions in the first year through the vehicle of a feature length motion picture. Similar statements appear in each of the prospectuses on the other partnerships. The prospectuses describe a close relationship between CFA as general partner and the organizations with which the partnerships were to deal. In the case of CFA Investors I, the motion picture was to be acquired from Studio 16, Inc. (Studio 16), the producer. Denver Sutton, a vice-president of CFA, was also Chief Executive Officer and the majority stockholder of Studio 16. Petitioner James Polakof (Polakof), president, director, and stockholder of CFA had been retained by Studio 16 as an independent contractor and management consultant from time to time. In the case of the other three partnerships, the movies were to be produced by CFA Productions, Inc., and marketed by CFA Marketing, Inc.; [4] both of these corporations were wholly *444 owned subsidiaries of CFA. All of those entities were represented by the same law firm. Studio 16 had no experience in making feature films; it specialized in making documentary and industrial films. Studio 16 ultimately "more or less became an integral part of the C.F.A. operation." CFA Productions had made no other films of any kind prior to its involvement with the CFA movies. The CFA Investors I prospectus states that, although this was CFA's "first partnership" venture, "the officers and directors of CFA have individually had considerable experience in limited partnership investment vehicles and, in some cases, motion picture production." Attachments to the prospectuses included as exhibits copies of the agreements of limited partnership to be entered into by CFA and the limited partners; a copy of the contract of sale of the particular motion picture to the partnership; financial projections; projected investment results; a legal opinion that each *445 partnership was entitled to be treated as such rather than as an association taxable as a corporation; and a subscription agreement form. An exhibit to the CFA Investors IV prospectus describes the income tax benefits as follows: INCOME TAX BENEFITS Equivalent Percentage First Year Tax Write-Off = 95% Potential income tax benefits for a motion picture investment are somewhat more complex than those from many other types of investments. For instance, an investment in an apartment project will usually result in tax benefits because the total sum of expenses plus depreciation is greater than the collected income. The resulting "paper loss" (usually called "write-off") may then be used to offset other sources of income, thereby resulting in a smaller tax bill. A properly structured motion picture investment also has write-off similar to the above example. But, in addition, it offers a second source of tax benefits through a device known as "investment tax credit". If a motion picture has a useful life of seven years or more, 7 percent of its cost may be taken as an investment tax credit and deducted directly from the federal, and in some cases state, tax bill of the owner *446 of the picture. This is obviously a particularly valuable tax benefit because it results in a dollar-for-dollar reduction in the tax bill itself; whereas write-off only reduces the taxable income and is therefore of decreasing benefit for lower tax brackets. For the purpose of simplicity in determining the value of investing in this partnership, the tax benefits from both write-off and investment tax credit have been combined into one overall hypothetical number based upon an investor in the 50-percent tax bracket. This number indicates that the potential income tax benefit in 1974 is equivalent to that of a write-off of approximately 95 percent on all capital contributed this year. The prospectuses explain that the partnerships' payments to CFA may include prepayments of interest, a management fee, and other advertising, promotion, and distribution costs in addition to the price of the motion picture. The price of each of the motion pictures was stated in the respective prospectuses and was not a matter of negotiation between CFA and the partnerships or CFA and the limited partners. Each partnership agreement provided that the partnership would expire on December 31, 1980, unless *447 partners holding 100 percent of the outstanding units voted in favor of continuation. No steps were taken to extend the partnerships. None of the partnerships made any cash distributions to their respective partners. Nor did any of them make any payments on the principal of the nonrecourse note to CFA. CFA Investors I - "Silence"
CFA Investors I was formed on April 16, 1973. An amendment to a certificate of limited partnership dated April 30, 1974, lists 21 limited partners who invested a total amount of $350,000. Eight of the 21 limited partners in this partnership are petitioners in this proceeding; 13 are not. [5]
On April 16, 1973, the same day it was formed, CFA Investors I entered into a contract of sale calling for Studio 16 to produce and sell to CFA Investors *448 I a motion picture entitled "A Cry in the Wilderness," the name of which was later changed to "Silence." Under the terms of the contract, the stated purchase price was $625,000, composed of a cash payment of $125,000 and a nonrecourse note in the amount of $500,000, bearing interest at the rate of 9 percent per annum and payable out of 40 percent of the net receipts from the motion picture "Silence." The outstanding balance on the note was to become due and payable on December 31, 1980, and, in the event of default, Studio 16 was given the right to foreclose on the motion picture. Subsequently, Denver Sutton, Chief Executive Officer and majority stockholder of Studio 16, became a shareholder in CFA, and he brought with him to CFA the Studio 16 facilities. Polakof was the producer of "Silence." He had no experience in making feature films before he began to produce the CFA movies. His background was in the fields of advertising and marketing. He had some experience in television commercials and industrial films. Before he set up these four partnerships, he had been involved in marketing and selling real estate investments via limited partnerships. Similarly, neither the script writer *449 nor the individual identified as the director had previously written or directed commercially successful feature films. Apart from one actor, Will Geer, the cast had little screen experience. As a general rule, experienced and well-known writers, directors, and casts are important in the marketing of films because theater owners tend to select films identified with individuals who have known performance records. Polakof informed the crew and technical staff working on "Silence" that it had to be finished and had to play somewhere, in any condition, before December 31, 1973, for tax reasons. Polakof instructed the crew and staff that the quality of the film did not matter and that heavy advertising would "get the people in the theater." "Silence" was in fact completed in December 1973 and was shown before the end of the year. The actual cost of producing "Silence" was $105,000 compared with average production costs at Metro-Goldwyn Mayer during 1972 and 1973, for example, of approximately $2,000,000. Higher budget films, as a rule, have a better chance of success than do low budget films because a higher budget permits a producer to obtain the services of actors and technicians *450 with more experience and talent. Compared with the stated purchase price of $625,000, "Silence" had no fair market value for theatrical purposes and a maximum fair market value of $30,000 for network television and other ancillary markets. Polakof attempted to market "Silence" by using a technique known as "four-walling." This technique calls for the distributor to rent several theaters in a local area for an agreed period and to use local television, radio, and newspapers to advertise heavily the movie to be shown during that period. A distributor's risk in using the four-walling technique is much greater than more conventional distribution arrangements because of the required commitments for theater rentals and advertising expenses. Four-walling of "Silence" was tried in Hawaii, Dallas, and Los Angeles but the movie was not a box office success. The following table shows the gross receipts, losses, depreciation, interest, and miscellaneous expenses of CFA Investors I as reported in its partnership returns for 1973 through 1977: Gross
Other
Year
Receipts
Losses
Depreciation
Interest
Deductions
1973
$ 100
$155,098.33
$ 5.21
$35,000
$120,193.12
1974
$605,362
$492,841.00
$210,000.00
$ 5,704
$882,495.00
1975
$ 18,567
$140,517.00
$116,044.00
$ 43,040.00
1976
$ 15,912
$ 99,250.00
$ 99,250.00
$ 12,377.00
1977
$ 3,802
$ 21,154.00
$ 23,763.00
$ 837.00
*451 The deductions for 1973 include prepaid interest of $35,000 to Studio 16 and a management fee of $45,000. Depreciation was computed under the income forecast method using a cost basis of $625,000 and estimating gross receipts of $12,000,000. Attached to the partnership returns are schedules K-1 showing the amounts of losses and the basis for investment tax credits passed through to the limited partners. CFA Investors IV - "He is My Brother"
CFA Investors IV was formed as a limited partnership in December 1973. The Amendment to Certificate of Limited Partnership of CFA Investors IV lists 34 limited partners, nine of whom are petitioners in this proceeding. [6] The total amount invested by the 34 limited partners was $525,000. On March 15, 1974, CFA Investors *452 IV entered into a contract of sale with CFA, whereby CFA agreed to produce and to sell to CFA Investors IV a motion picture entitled "He is My Brother." The price of the picture was $1,425,000 and was to consist of cash in the amount of $225,000 and a nonrecourse note for the balance of $1,200,000. The note was to bear interest at the rate of 10 percent per annum and was to be payable out of 40 percent of the net receipts from the motion picture. The note was to become due December 31, 1980, and was to be secured by a lien on the movie. CFA undertook to distribute "He is my Brother" by the more traditional percentage method whereby CFA shared the screening proceeds with the theater owner on a percentage basis. The film was commercially exhibited in 1974. In 1974 and 1975, CFA went to theater chains such as United Artists and General Cinema Theaters and secured some exhibitions. The film was finally turned over for distribution to Manson International, a film distributor, but it has not had much success. Compared with a stated purchase price of $1,425,000, "He is My Brother" had a fair market value of not more than $12,500 for theatrical exhibition purposes and not more than *453 $50,000 for network television and other ancillary markets. The following table shows the gross receipts, losses, depreciation, interest, and other deductions reported by CFA Investors IV for 1974 through 1977: Gross
Other
Year
Receipts
Losses
Depreciation
Interest
Deductions
1974
$ 50
$210,361
$ 24
$ 80,000
$130,387
1975
$11,837
$202,469
$57,217
$103,254
$ 53,835
1976
$ 4,553
$ 39,649
$ 39,649
$ 4,553
1977
$ 3,802
$ 30,500
$33,109
$ 837
A schedule attached to the 1974 partnership return shows that the "other deductions" included a $60,000 management fee. The partnership used a cost basis of $1,450,000 for the motion picture. Attached to the partnership returns are schedules K-1 for each partner documenting the pass-through of the reported losses and the basis of the movie for investment tax credit purposes. CFA Investors V - "Sunburst"
CFA Investors V was organized as a limited partnership in December 1973. An Amendment to Certificate of Limited Partnership dated April 8, 1975, lists 33 limited partners who invested a total amount of $525,000 in the limited partnership. Five of the 33 limited partners *454 in the partnership are petitioners [7] in this proceeding; 28 are not. On June 10, 1974, CFA Investors V entered into a contract of sale with CFA providing for the future production and sale by CFA of a motion picture entitled "Sunburst." The stated purchase price of the movie was $1,425,000 composed of a cash payment of $225,000 and a nonrecourse note of $1,200,000, bearing interest at the rate of 10 percent per annum payable out of 40 percent of the net receipts from the motion picture. The note was to become due on December 31, 1980, and was secured by a lien on the movie. CFA completed the production of "Sunburst" and delivered it in 1974. The movie was exhibited before the end of the year. Records no longer exist with respect to the actual cost of production. CFA attempted to distribute "Sunburst" using the percentage method but did not succeed. This film also was eventually turned over for distribution to Manson *455 International. Compared with a stated purchase price of $1,425,000, "Sunburst" had no fair market value for theatrical exhibition purposes and not more than $25,000 for network television and other ancillary purposes. The following table shows the gross receipts, losses, depreciation, interest, and miscellaneous expenses of CFA Investors V for 1974 through 1977: Gross
Miscellaneous
Year
Receipts
Losses
Depreciation
Interest
Deductions
1974
$ 50
$249,192
$ 24
$ 80,000
$169,168
1975
$7,766
$182,907
$37,541
$110,125
$ 43,007
1976
$2,337
$ 56,272
$56,272
$ 2,337
1977
$1,461
$ 34,911
35,179
$ 837
The interest deduction for 1974 was shown to have been paid to CFA. The cost or other basis for depreciation and investment credit purposes was shown as $1,450,000. Attached to the partnership returns are schedules K-1 showing the amounts of losses and the basis for investment credits passed through to the partner-petitioners. CFA Investors VII - "How to Become a Movie Star"
CFA Investors VII was organized as a limited partnership in March 1974. According to an Amendment to the Certificate of Limited Partnership *456 of CFA Investors VII, dated April 8, 1975, 14 individuals invested a total amount of $70,000 in the partnership. Polakof is the only partner who is a petitioner in this proceeding. On December 1, 1974, CFA Investors VII entered into a contract of sale with CFA providing for the future production and sale by CFA of a film entitled "How to Become a Movie Star" (sometimes hereinafter "Movie Star"). The contract called for a total payment by CFA Investors VII of $115,000, consisting of cash of $25,000 and a nonrecourse note for $90,000, bearing interest at the rate of 10 percent per annum and becoming due and payable on December 31, 1981. The note was payable out of 50 percent of the net receipts from the film. Pursuant to the contract, CFA Investors VII made the $25,000 cash payment. "How to Become a Movie Star" is a short subject 18-minute film which features Polakof asking questions of actors on how they broke into the movies. None of the actors were widely known. The film was not successfully distributed. It had a fair market value of zero for theatrical exhibition as well as network television and other ancillary purposes. The following table shows the gross receipts, losses, *457 depreciation, interest, and miscellaneous deductions reported by CFA Investors VII in partnership returns for 1974 through 1978: Gross
Miscellaneous
Year
Receipts
Losses
Depreciation
Interest
Deductions
1974
$100
$41,546
$ 46
$9,000
$32,600
1975
$17,375
$5,750
$6,400
$ 5,225
1976
1977
$ 1,193
1978
$ 237
For 1974, the miscellaneous deductions consist of a management fee of $25,000 and "mkt & dist" of $7,600. For 1975, the miscellaneous deductions include a flat $5,000 for travel and entertainment. Attached to the partnership returns are schedules K-1 showing the amounts of losses and the basis for computing investment tax credits passed through to the partners. Petitioners claimed deductions and investment credits based on the respective amounts shown for them on the schedules K-1 attached to the several partnership returns filed by the four partnerships. In the notices of deficiency issued to petitioners, respondent disallowed the deductions on several grounds. The notice of deficiency issued to Polakof contains the following "Explanation of Items:" EXPLANATION OF ITEMS
(a) It is determined that the *458 partnership loss claimed on your 1974 and 1975 returns for CFA Investors is not allowed because it has not been established that the acquisition of the movie was an activity entered into for profit. Additionally it is determined that the claimed partnership loss is disallowed for the following reasons: The loss attributable to depreciation is disallowed because the fair market value of the film has not been established and therefore the loan to which the film is subject cannot be considered as the partnership's liability and cannot be included in the partner's basis. Additionally, the loss deduction attributable to a part of the film's depreciation is disallowed because the non-recourse loan lacks economic substance and the amount of the loan cannot be added to the depreciable basis of the film. Also, it is determined that the partnership's method of depreciation does not bear a proper relationship to a decline in the film's usefulness. The amount deducted as partnership loss attributable to interest expense is disallowed because this expense, if paid, and further if paid for the purpose designated, was not in substance paid by the partnership. Furthermore, the purported loans *459 received by the partnership do not constitute bona fide loans. Moreover, the loan cannot be added to the partner's basis. The partnership loss attributable to the current deduction of management fees, and marketing and distribution expense are disallowed because it has not been established that these expenses were paid, and if paid, constitute ordinary and necessary business expenses and were expended for the purpose designated. Additionally, these costs are disallowed because these costs are expected to contribute substantially to the realization of income in subsequent years. The notices of deficiency issued to the other petitioners contain basically similar explanations. OPINION At issue is the allowability of deductions taken by the several petitioners of the losses claimed by the four partnerships, CFA Investors I, CFA Investors IV, CFA Investors V, and CFA Investors VII, for 1973 through 1977 and each petitioner's share of the claimed investment credit passed through the partnerships pursuant to section 1.46-3(a), Income Tax Regs.[8] The losses claimed by the partnership are attributable to deductions for rent, depreciation, management *460 fees, interest, and miscellaneous items such as advertising, distribution expense, travel expenses, and the like. In the main, the interest deductions are attributable to purported interest payments on the non-recourse notes given by the partnerships as part of the alleged purchase price for the movies here at issue. To qualify the management fees, rent, and miscellaneous deductions, petitioners have the burden of proving that the expenses were paid or incurred in carrying on a "trade or business" within the meaning of section 162(a). [9] The depreciation deductions turn on, among other things, whether the movie properties were "used" in a "trade or business" within *461 the meaning of section 167(a)(1). [10]Under section 48(a)(1), [11] the investment credit is allowable only for "property with respect to which depreciation (or amortization in lieu of depreciation) is allowable." Thus, petitioners' right to these deductions as well as the investment credit depends upon a showing that the activities from which the deductions arose constituted a "trade or business." See Flowers v. Commissioner,80 T.C. 914, 931 (1983); Pike v. Commissioner,78 T.C. 822, 841-842 (1982), affd. without published opinion 732 F.2d 164 (9th Cir. 1984). *462 The allowability of the deduction for interest under section 163(a)[12] depends upon a showing that the nonrecourse notes constituted genuine indebtedness. Odend'hal v. Commissioner,80 T.C. 588, 604-605 (1983), affd. 748 F.2d 908 (4th Cir. 1984). 1. The Trade or Business Deductions
Essential to petitioners' showing that the four partnerships were engaged in a "trade or business" is a demonstration of an "actual and honest objective of making a profit." Dreicer v. Commissioner,78 T.C. 642, 646 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). While a reasonable expectation of profit is not required, the objective of making a profit must be bona fide. Allen v. Commissioner,72 T.C. 28, 33 (1979). *463 In the case of a partnership, the determination as to whether there was an actual objective of making a profit must be made at the partnership level. Brannen v. Commissioner,722 F.2d 695, 703-704 (11th Cir. 1984), affg. 78 T.C. 471 (1982); Goodwin v. Commissioner,75 T.C. 424, 437 (1980), affd. without published opinion 691 F.2d 490 (3d Cir. 1982); Hager v. Commissioner,76 T.C. 759, 784 (1981). Because a limited partnership acts only through the general partner, we look to the actions of the general partner, CFA in this case, to determine whether the partnerships had a profit motive. Wildman v. Commissioner,78 T.C. 943, 953-954 (1982); Siegel v. Commissioner,78 T.C. 659, 698-704 (1982). As stated in our findings, the prospectus on each of the partnerships states that the partnership had two objectives: (1) "to maximize the distributed return on investors' capital" and (2) "to provide investors with significant Federal Income Tax deductions in the first year through the vehicle of a feature length motion picture" or, in the case of CFA Investors VII, "a documentary *464 motion picture." Other parts of the prospectuses emphasize tax benefits beyond the first year. A partnership activity does not constitute a trade or business unless the partnership engages in the activity with the predominant, primary or principal objective of making a profit. Flowers v. Commissioner,supra at 931; Siegel v. Commissioner,supra at 698; see also Hirsch v. Commissioner,315 F.2d 731, 736 (9th Cir. 1963), affg. a Memorandum Opinion of this Court; Lemmen v. Commissioner,77 T.C. 1326, 1340 (1981). We must, then, decide whether realizing a return on the investors' capital or providing the investors with tax benefits was the predominant objective of the partnerships. The resolution of this issue turns not on one factor alone but on the basis of all the facts and circumstances. Allen v. Commissioner,supra at 34; Jasionowski v. Commissioner,66 T.C. 312, 319, 321 (1976). *465 Some of the relevant factors to be considered in determining whether an activity is engaged in for profit are listed in section 1.183-2(b), Income Tax Regs.[13] In deciding whether making a profit was the predominant objective of the partnerships, greater weight is to be given to objective facts than to a mere statement of a taxpayer's intent. Siegel v. Commissioner,supra at 696-698; Engdahl v. Commissioner,72 T.C. 659, 666 (1979). *466 Based on all of the evidence of record, we find that petitioners have not shown that the predominant purpose or objective of CFA, as general partner, was to make a profit on behalf of the partnerships. In reaching this conclusion, we have taken into full account the risks of losses inherent in making and marketing movies. We are convinced, however, that CFA's predominant primary or principal objective was to make money for itself and its owners as the promoters and to garner tax benefits for the limited partners. As limited partners, petitioners are not, therefore, entitled to deduct the partnership losses insofar as they are attributable to the trade or business deductions. A. CFA Grossly Overpriced the Motion Pictures
The partnership's purchase of the movies was not handled in a businesslike manner. Sec. 1.183-2(b)(1), Income Tax Regs.CFA sold the movies to the partnership at prices far in excess of their fair market value. There was no reasonable prospect from the beginning that the movies would ever produce enough net revenue to permit the limited partners to recover their cash investment, let alone pay the nonrecourse notes and make *467 a profit. The following table summarizes and compares our findings as to the total prices paid for the movies, the cash payments, and the fair market values of the motion pictures: Partnership--
Stated
Nonrecourse
Cash
Total
Movie
Purchase Price
Note
Payment
Value
CFA I -
$ 625,000
$ 500,000
$125,000
$30,000
"Silence"
CFA IV -
$1,425,000
$1,200,000
$225,000
$62,500
"He is My
Brother"
CFA V -
$1,425,000
$1,200,000
$225,000
$25,000
"Sunburst"
CFA VII -
$ 115,000
$ 90,000
$ 25,000
"Movie Star"
In making our findings as to the fair market values of the motion pictures, we have adopted the valuations given in reports introduced through the testimony of William Madden (Madden) and Robert Newgard (Newgard), both of whom are eminently qualified experts. After 25 years of sales work for Metro-Goldwyn Mayer studios, Madden served as that company's general sales manager and vice-president from 1969 to 1973. Newgard spent a career, from 1952 to 1980, buying or selling programs for television and has continued to work in this field. Both witnesses were able, well informed, objective, and reasonable in presenting their testimony and *468 reports. Their opinions were not altered by cross-examination. [14]
These witnesses based their valuations on their judgment as to the marketability of each picture, taking into account such factors as the strength of the story, the ability and experience of the producer, director, and cast, the photography and music and sound as well as the costs of exploiting the films, including the costs of prints, advertising, and other marketing activities. We think their opinions as to values as of the dates the movies were bought and sold are reasonable. The complete lack of success in marketing any of the films indicates that their opinions were, indeed, generous. The overpricing of the movies by CFA was made possible by the intimate relationship which existed between CFA as the general partner of the partnership which purchased the films and CFA (and Studio 16) [15] as the sellers of the films. Polakof as president, director, and stockholder of CFA dominated the whole scene. As a general *469 partner, CFA "did not have any type of valuation made of the movie[s] prior to * * * [their] purchase by the partnership[s]." Brannen v. Commissioner,722 F.2d 695, 704-705 (11th Cir. 1984), affg. 78 T.C. 471 (1982). The price of each movie was set in the respective partnership prospectuses long before the movie was made. Because CFA was both general partner and seller of the movies, there were no negotiations for more reasonable prices either before the contracts of sale were signed or after the movies were completed and realistic judgments could be made as to the movies' values. As a result, there was never any real prospect that the notes would be paid. See Barnard v.Commissioner,731 F.2d 230, 231 (4th Cir. 1984), affg. sub nom. Fox v. Commissioner,80 T.C. 972 (1983). Although this overpricing of the films helped doom the partnerships to financial failure, it was wholly consistent with the tax benefits that CFA promised *470 the limited partners. As computed in the partnership returns, the partnerships' bases for depreciation of the movies and for investment tax credit purposes included the amounts of the respective nonrecourse notes. Any reduction of the amounts of these notes would have decreased the tax benefits promised the investors in the several prospectuses. Had the nonrecourse notes been reduced substantially, CFA would not have been able to fulfill its promise to the CFA Investors IV limited partners of the equivalent of a 95-percent tax write-off in the first year. [16] Cf. Fox v. Commissioner,80 T.C. 972, 1006 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. sub nom. Barnard v. Commissioner,731 F.2d 230 (4th Cir. 1984), affd. without published opinion sub nom. Kratsa v.Commissioner and Leffel v. Commissioner,734 F.2d 6 (3d Cir. 1984), affd. without published opinion sub nom. Hook v. Commissioner,734 F.2d 5 (3d Cir. 1984), affd. without published opinion sub nom. Rosenblatt v. Commissioner,734 F.2d 7 (3d Cir. 1984), affd. without published opinion *471 sub nom. Zemel v. Commissioner,734 F.2d 9 (3d Cir. 1984). *472 This large first year tax write-off was made possible in large part by including the nonrecourse notes in the partnerships' bases for investment tax credit purposes. The promised availability of the investment tax credit, an added tax benefit, was important in the promotion of the movie partnerships. It was not available for real estate investments. Polakof testified that many of the investors in these four partnerships were individuals who had invested in his earlier real estate syndications. In his words, "Our investors felt that actually the return could be quicker than real estate." We interpret this testimony to refer to the tax benefits. We think it is a reasonable inference that the partnerships' purchase of the movies at prices (including the nonrecourse notes) far beyond their fair market values was an integral part of the plan for achieving the objective of providing tax benefits for the limited partners. The overpricing also benefited CFA to the extent of the cash payments it received; those payments were specified in the prospectuses and were not the subject of negotiations. We think the overpricing of the movies is inconsistent with an actual and honest objective *473 of making a profit for the partnerships from the movies. Brannen v. Commissioner,78 T.C. 471, 508-509 (1982), affd. 722 F.2d 695 (11th Cir. 1984); Estateof Baron v. Commissioner,83 T.C. 542 (1984). B. The Prepayment of Interest and Management Fees Left thePartnerships Without Adequate Capital
Ordinarily, when a new profit-motivated venture is undertaken, the entrepreneurs conserve available capital for use in carrying on the enterprise. CFA as general partner did just the opposite. It stripped the partnerships of much of their available capital by prepaying two major items: interest and management fees. The prospectus for CFA Investors I states in part: 11. DUTIES AND COMPENSATION OF GENERAL PARTNER A. Duties: During the life of the Partnership, CFA will furnish to the Partnership financial, marketing and operational counsel necessary to place the Partnership in a position to conduct the business for which it was formed and to accomplish the objectives of the Partnership. B. Initial Non-Recurring Compensation: For the services described in Paragraph A above which relate to the start-up activities *474 of the Partnership, CFA will receive a non-recurring start-up fee of $45,000. The other prospectuses contain similar provisions except that for CFA Investors IV and CFA Investors V, the start-up fee was $60,000 in each case; and for CFA Investors VII, the fee was $25,000. Provisions for these start-up management fees were carried forward into the executed contracts of sale. Polakof, who had been engaged in "marketing limited partnerships" involving real estate, explained that such management fees were "very traditional in the real estate field." In addition, the prospectuses state that: "The Partnership may prepay and deduct in the year paid interest for a period not exceeding one year beyond the end of the taxable year in which the payment is made." As discussed above, those notes had no relationship to the movies' value and were uncollectible from the outset. Yet first-year interest on them was prepaid. The following table shows the total amount invested in each partnership, the purchase price of its movie, the prepaid interest deducted, and the management fee in the first year: Cash
Total
Movie
Prepaid
Management
Partnership
Investment
Price
Interest
Fee
CFA Investors I
$350,000
$125,000
$35,000
$45,000
CFA Investors IV
$525,000
$225,000
$80,000
$60,000
CFA Investors V
$525,000
$225,000
$80,000
$60,000
CFA Investors VII
$ 70,000
$ 25,000
$ 9,000
$25,000
*475 As shown in our findings, the first partnership returns for CFA Investors I and VII report gross income of only $100. The first partnership returns for CFA Investors IV and V report gross income of only $50. These prepayments of management fees and interest were thus made from capital and amounted to more than one-third of the capital remaining the each of the partnerships after making the cash payments for their respective movies. Indeed, in the case of CFA Investors VII, the prepayment of the management fee and interest in the nonrecourse note plus the cash payment for its movie, "Movie Star," left only $11,000 to cover all market, distribution, overhead, and related expenses. Significantly, as his reason for the partnerships' inability to finance the distribution and the eventual financial failure of "He is My Brother," "Sunburst," and "Movie Star," Polakof cited lack of sufficient capital. The prepayment of the management fees and interest on the nonrecourse notes served the objective of providing large first-year tax deductions for the limited partners. These outlays, of course, were deducted by the partnership and the partnership deductions figured in the partnership losses. *476 Those losses were passed through to the limited partners and deducted on their individual returns. CFA was, of course, recipient and beneficiary of the payments. Further, because the partnerships' nonrecourse notes were secured by the respective movies, CFA as holder of the notes became entitled, upon the partnerships' failure to pay the notes, to foreclose its liens. The utter impossibility of paying the notes removed any incentive for the limited partners to extend the partnerships beyond December 31, 1980. According to Polakof, CFA became owners of the movies, for whatever they may be worth. Polakof testified that he continues to receive small amounts of income from at least some of the movies. The prepayment of interest and management fees thus contributed to the ultimate failure of the partnerships. Nonetheless, it served the tax-benefit interests of the limited partners as well as the financial interests of CFA and the partnership promoters. 3. The Lack of Experience of the Producers, Directors, and, in General, the Cast of the Movies Contributed to their Failure
The promoters of these four partnerships had no expertise in the production or distribution *477 of feature-length movies. CFA, the general partner in all four partnerships, was not organized until 1973, the year in which all of the partnerships, except CFA Investors VII, were organized. CFA Investors VII was organized later, in 1974. The organizers, shareholders, and officers of CFA were Polakof, president and chairman of the board; Reginald Olsen, executive vice-president; Ronald Peck, vice-president and treasurer; and Denver Sutton, vice-president. Polakof, Olsen, and Peck had been employed by an organization named Systech which was engaged in syndicating real estate partnerships. Sutton operated Studio 16 which had produced some short subject or documentary films. When CFA Investors I was being organized, Studio 16 had only a few "small jobs" and Polakof was able to arrange to use its facilities in producing the movies. For the most part, the writer and directors and the cast, with one or two exceptions, were not experienced in making feature-length movies. This lack of experience showed up in the quality of the movies. In fact, Polakof instructed the staff working on "Silence" that quality was not important--that having the movie shown before the end of the year, for *478 tax reasons, was the pressing concern. Further, because the movies were bought before they were produced, no one acting on behalf of the partnerships had any control over the quality of the work. According to credible expert testimony, distribution of a movie of poor quality, with no well known names connected with it, is extremely difficult. Theater owners have large numbers of pictures from which they make their selections for showing, and they tend to select films with producers, directors, and actors who are known to the public. Moreover, theater owners exchange information quickly on the public reaction to movies in different localities. This means that a poor response to a showing in one location makes it much more difficult to arrange a showing in another locality. Polakof was evidently aware that the partnerships' movies would be difficult to market because he attempted to "four-wall" the first one, "Silence." The prospectuses indicate that a "multi-saturation" method of distribution was also planned for "He is My Brother" and "Sunburst." He apparently had the idea that any movie, regardless of its quality, could be successfully distributed with enough advertising.
*479 Had Polakof and his associates consulted an expert of the caliber of William Madden, respondent's expert witness, they would have learned that the successful period of four-walling as a movie marketing method was the late 1960's and early 1970's. By 1974, the four-walling method was "practically finished," and this was "generally known to the industry." The dismal failure of CFA's efforts to four-wall "Silence" in Los Angeles showed its weakness as a motion picture and confirmed Madden's opinion on the ineffectiveness of four-walling as a means of marketing the movies. Polakof's insistence that "Silence" be finished without regard to quality so that it could be shown at least once in 1973 is thus hardly consistent with a profit-making objective. It is perfectly consistent, however, with the objective of providing large first-year tax write-offs for the limited partners. As we have noted, the first-year partnership returns show gross income of $50 for each of two of the partnerships (CFA Investors IV and CFA Investors V) and $100 for each of the other two partnerships (CFA Investors I and CFA Investors VII). These small amounts of income were necessary in order to provide a basis *480 for contending that the movies were "placed in service" in the first year for investment tax credit purposes under section 48(a)(1) and were "used in a trade or business" in that year for depreciation purposes under section 167(a)(2); these small amounts of income likewise were apparently intended to show that the partnerships were "carrying on a trade or business" under section 162(a). CFA's disregard of the quality of the films is further evidence that the predominant purpose of the partnerships was not to make a profit, but to provide tax benefits for the partners. We are aware that CFA Investors I expended substantial sums in distributing "Silence" through four-walling procedures and had some receipts, first in Hawaii, then in Dallas, and finally in Los Angeles; a small amount of the moneys used for this purpose was apparently borrowed from the Bank of America. These expenditures account for a considerable portion of the loss of $492,841 reported on CFA Investors I's partnership return for 1974. We note, however, that a $210,000 deduction for depreciation based mainly on treating the nonrecourse note as part of the partnership's basis for the movie is included in that loss. *481 An exhibit analyzing the expenditures for 1974 also shows that a total amount of over $140,000 of the actual expenditures were classified under the general heading "Distribution and marketing services rendered." Polakof, Peck, and Olsen are shown as the recipients of a lion's share of the outlays for that purpose during the portion of the year for which individual payees are named. Had CFA Investors I's capital been conserved in a business-like manner, the outside loans might not have been required. Although the expenditures for four-walling "Silence" provide some evidence of a profit motive, we do not find such evidence sufficient to carry petitioners' burden. The prospectus on "Silence" makes the representation that the movie would be four-walled and uses it as a selling point. Polakof also made the point in his conversations with the director of the picture and the staff. The promoters thus obligated themselves to the investors to make the four-walling effort even though they may not have fully contemplated the magnitude of the losses that would be incurred. Had they consulted an expert in marketing films, such as Madden, they would have learned that successful four-walling *482 was no longer probable in 1974 even with a strong film, and was virtually impossible with a weak one like "Silence." CFA's failure to investigate the risks involved in the venture is further evidence of its failure to proceed in a businesslike manner. Sec. 1.183-2(b)(1), Income Tax Regs.; Surloff v. Commissioner,81 T.C. 210, 237 (1983), 2. Interest Deduction
Section 163(a) provides for the allowance of a deduction for "all interest paid or accrued within the taxable year on indebtedness." The cases are now legion, however, holding that, for the deduction to be allowable, the indebtedness must be genuine. If the purchase price and the principal amount of a nonrecourse note unreasonably exceed the value of the property to be purchased, then no genuine indebtedness exists. See, e.g., Estateof Franklin v. Commissioner,544 F.2d 1045, 1048-1049 (9th Cir. 1976), affg. 64 T.C. 752 (1975); Hager v. Commissioner,76 T.C. 759 (1981); Odend'hal v. Commissioner,80 T.C. 588, 604-605 (1983), *483 affd. on this issue 748 F.2d 908 (4th Cir. 1984); Brannenv. Commissioner,78 T.C. 471, 493 (1982), affd. 722 F.2d 695 (11th Cir. 1984). In the foregoing, we have contrasted the relatively minimal values of the four movies with the huge nonrecourse notes given CFA. That wide disparity demonstrates that the notes were not genuine indebtedness and the partnerships' claimed interest deductions are not allowable. To reflect the foregoing, Decisions will be entered for the respondent.
Footnotes
1. The following cases are consolidated herewith: Roy C. Peterson, docket No. 13875-80; Clarence H. Steinhebel and Gertrude Steinhebel, docket No. 15666-81; Lee E. Schwartz and Vera J. Schwartz, docket No. 20512-81; Michael A. and Sue B. Baker, docket No. 25657-81; Leonard A. Vinci, docket Nos. 25658-81 and 25659-81; Ken B. and Marilyn K. Teakle, docket No. 29625-81; George P. and Ramona T. Golf, docket No. 29626-81; Roman J. and Lorraine A. Oleynik, docket No. 29627-81; John and June Ferreri, docket No. 29629-81; Dean S. Merrick and Marilyn Merrick, docket No. 29630-81; Francis X. Driscoll and Patricia B. Driscoll, docket No. 30040-81; William and Carol Talty, docket No. 31015-81; David and Frances Stevenson, docket No. 1764-82; Arlyn and Sharon Blackwell, docket No. 1765-82.↩
2. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted. ↩
3. Respondent has raised a number of other issues as grounds for denying all or part of the claimed deductions, including failure to substantiate some of the alleged expenditures claimed as deductions; that prepaid management fees were start-up expenses which must be capitalized; that the nonrecourse notes may not be included in basis for depreciation or investment credit purposes; that the depreciation method used by the partnerships was not a proper one. We find it unnecessary to consider these arguments.↩
4. The prospectus on CFA Investors VII does not specifically mention CFA Marketing, Inc., but states that the film "will be exhibited as a 'featurette' on the same program with one of CFA's feature-length motion pictures."↩
5. These counts of the number of limited partners treat a husband and wife as a separate partner. The following petitioners invested in CFA Investors I: ↩
Partner
Amount Invested
Michael A. Baker
$15,000
Arlyn Blackwell, et ux.
$10,000
John Ferreri
$10,000
Dean S. Merrick
$30,000
Roy C. Peterson
$10,000
Lee E. Schwartz
$15,000
Leonard A. Vinci
$15,000
Ken B. Teakle
$10,000
6. The petitioners involved in CFA Investors IV and the amounts of their investments are as follows: ↩
Partner
Amount Invested
Michael A. Baker
$15,000
Roy C. Peterson
$15,000
Arlyn N. Blackwell, et ux.
$15,000
Dean S. Merrick, et ux.
$22,500
Ken B. Teakle, et ux.
$15,000
Leonard A. Vinci
$15,000
John P. Ferreri, et ux.
$ 7,500
William J. Talty
$15,000
Roman J. Oleynik
$15,000
7. The following partners are petitioners in this proceeding: ↩
Partner
Amount Invested
Roman J. Oleynik
$15,000
Francis K. Driscoll, et ux.
$15,000
Clarence M. Steinhebel, et ux.
$22,500
David Stevenson
$ 7,500
George P. Golf
$ 7,500
8. Sec. 1.46-3(a), Income Tax Regs., contains the following language: Section 38 property placed in service [for investment tax credit purposes] by the taxpayer during the taxable year includes the taxpayer's share of the basis (or cost) of section 38↩ property placed in service by a partnership in the taxable year of such partnership ending with or within the taxpayer's taxable year. * * *
9. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General.--There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *. ↩
10. SEC. 167. DEPRECIATION. (a) General Rule.--There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)-- (1) of property used in the trade or business * * *. ↩
11. SEC. 48. DEFINITIONS; SPECIAL RULES. (a) Section 38 Property.-- (1) In general.--Except as provided in this subsection, the term "section 38 property" means-- (A) tangible personal property * * * * * * Such term includes * * * property with respect to which depreciation (or amortization in lieu of depreciation) is allowable and having a useful life (determined as of the time such property is placed in service) of 3 years or more. * * *↩
12. SEC. 163. INTEREST. (a) General Rule.--There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness.↩
13. Sec. 1.183-2. Activity not engaged in for profit defined. (b) Relevant factors. In determining whether an activity is engaged in for profit, all facts and circumstances with respect to the activity are to be taken into account. No one factor is determinative in making this determination. In addition, it is not intended that only the factors described in this paragraph are to be taken into account in making the determination, or that a determination is to be made on the basis that the number of factors (whether or not listed in this paragraph) indicating a lack of profit objective exceeds the number of factors indicating a profit objective, or vice versa. Among the factors which should normally be taken into account are the following: (1) Manner in which the taxpayer carries on the activity. * * * (2) The expertise of the taxpayer or his advisors. * * * (3) The time and effort expended by the taxpayer in carrying on the activity. * * * (4) Expectation that assets used in activity may appreciate in value. * * * (5) The success of the taxpayer in carrying on other similar or dissimilar activities. * * * (6) The taxpayer's history of income or losses with respect to the activity. * * * (7) The amount of occasional profits, if any, which are earned.* * * (8) The financial status of the taxpayer. * * * (9↩) Elements of personal pleasure or recreation. * * *
14. Petitioners offered expert testimony on the movies' values but we did not find it convincing in terms of the qualifications of the expert on in terms of the reasonableness of the conclusions.↩
15. As stated in our findings, Studio 16 became a part of CFA when Denver Sutton brought its facilities to CFA. The two organizations may thus be treated as a single entity.↩
16. The statement on an investor's 95-percent first year tax write-off appears only in the prospectus for CFA Investors IV, but CFA Investors IV is not distinctive in terms of the tax benefits promised. All four of the partnerships follow the same pattern in otherwise describing the tax benefits. The record does not explain the absence of that representation in the other prospectuses. The following statement of the court of appeals in Barnard v. Commissioner,731 F.2d 230, 231 (4th Cir. 1984), affg. sub nom. Fox v. Commissioner,80 T.C. 972 (1983), involving a book purchase tax shelter, is apposite: Summarily, the tax-minimizing scheme, an evasion not a mere avoidance of tax liability, was structured so that, if not a single copy of the book were ever marketed, nevertheless, the "deductions" generated for income tax purposes would, for high bracket taxpayers * * *, be so great that they would, if the fabricated "deductions" were allowed, reduce taxes by a substantially greater amount than the relatively small sums contributed in cash * * * by each taxpayer.↩