THOMAS P. POAST AND SHEILA A. POAST, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Poast v. Commissioner
Docket No. 2254-92
United States Tax Court
T.C. Memo 1994-399; 1994 Tax Ct. Memo LEXIS 405; 68 T.C.M. (CCH) 430; 94-2 U.S. Tax Cas. (CCH) P47,961; August 18, 1994, Filed *405 Decision will be entered pursuant to Rule 155. For petitioners: Michael G. Florez. For respondent: Stephen J. Neubeck. FAY
FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: This case was assigned to Special Trial Judge Helen A. Buckley pursuant to section 7443A(b)(4) and Rules 180, 181, and 183. [1] The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE BUCKLEY, Special Trial Judge: In her notice of deficiency, respondent determined deficiencies in petitioners' Federal income taxes for taxable years 1986 and 1987, together with additions to tax, in the following amounts: Additions to Tax
Year
Deficiency
Sec. 6653(a)(1)(A)
Sec. 6653(a)(1)(B)
1986
$ 3,960.00
$ 198.00
[1]
1987
3,192.00
159.60
[1]
*406 We subsequently granted respondent leave to file an Amendment to Answer, wherein respondent seeks increased deficiencies and additions to tax. The total amounts of respondent's asserted deficiencies and additions to tax are as follows: Additions to Tax
Year
Deficiency
Sec. 6653(a)(1)(A)
Sec. 6653(a)(1)(B)
1986
$ 8,542.00
$ 427.10
[1]
1987
9,715.65
485.78
[1]
Petitioners filed an amendment to their petition in which they claim they had overpayments of taxes in the amounts of $ 1,913 and $ 2,065 for 1986 and 1987, respectively. After concessions, [2] the issues for decision are: (1) Whether petitioners engaged in their Amway activity for profit within the meaning of section 183; (2) if so, whether petitioners are entitled to deduct expenses incurred in carrying out the Amway activity in an amount greater than that allowed by respondent; (3) whether petitioners are entitled to a refund on an overpayment based on the amount of income and expenses relating to their Amway activity; and (4) whether petitioners are liable for additions to tax for negligence pursuant to section 6653(a). *407 FINDINGS OF FACT Some of the facts have been stipulated, and they are so found. The stipulations and attached exhibits are incorporated herein by reference. Petitioners resided at Franklin, Ohio, when they timely filed their petition herein. This case is unusual in that petitioners have disavowed the returns they filed for 1986 and 1987 as well as their ledger records and claim that in fact they have overpaid their taxes for each year. Respondent, on the other hand, has now alleged in the Amended Answer that petitioners were not engaged in their Amway activities for profit within the meaning of section 183, so that no deductions are allowable greater than any profit realized from that activity. The parties have in effect redone a complete accounting of petitioners' records for the 2 years at issue and have arrived at the following agreed amounts shown by petitioners' records. They do not, however, agree as to the deductibility of any particular item of expense. Account
Agreed
Number
Account Title Amounts
1986
Income
6101
ESA-2284 Sales Invoice
$  8,181.40
6401
SA-291 Monthly Bonus Check
8,573.20
6501
SA-1 Sales to Downliners
16,296.00
6502
Personal Shopper Sales
224.61
7901
Samples
1,527.61
7902
Self/Use
3,218.99
7903
T-S Literature
599.35
38,621.16
Costs of Goods Sold
Beginning Inventory
4,513.00
7101
SA-676 ADA Warehouse
7201
SA-1 Purchase from Direct
38,132.00
7301
SA-2R ADA Warehouse
Ending Inventory
-5,122.00
37,533.00
Expenses
8111
Insurance
648.00
8121
Bank Service Charges
227.00
8131
Dues & Publications
523.00
8141
Office Supplies & Expenses
2,416.88
8171
Telephone
1,468.00
8191
Business Interest
361.00
8201
Auto Repairs
1,541.54
8211
Gas & Oil
1,322.85
8251
Seminars - Airline & Travel
1,354.00
8301
Seminar Fees
1,345.10
8311
Seminars - Hotel/Motel
164.00
8411
Sales Promotion
1,955.00
8441
Sales Meeting Expense
427.04
8451
Awards, Flowers, Gifts
806.00
8461
Prospective Downliner Exp.
460.00
8471
Restaurant Expense
5,191.09
8481
Film/Promotional
911.00
8491
Bonus Paid
1,486.00
8511
Professional Fees
2,615.00
25,222.50
Account
Agreed
Number
Account Title
Amounts
1987
Income
301
ESA-2284 Sales Invoice
$  6,928.26
303
SA-291 Monthly Bonus Check
4,368.29
305
SA-1 Sales to Downliners
19,490.19
307
Personal Shopper Sales
2,411.74
33,198.48
Costs of Goods Sold
Beginning Inventory
$  5,112.00
401
SA-676-ADA Warehouse
4,423.25
403
SA-1 Purchases from Direct
0.00
405
SA-2R ADA Warehouse
26,217.99
407
Shipping Costs
0.00
409
Samples
-637.25
413
T-S Literature
-211.81
Ending Inventory
-5,225.00
29,679.18
Expenses
503
Insurance
1,237.59
505
Bank Service Charges
421.00
507
Dues & Publications
875.53
509
Office Supplies & Expenses
2,180.13
517
Telephone
1,460.96
521
Supplies & Materials
1,400.78
523
Business Interest
297.00
525
Auto Repairs
2,707.05
527
Gasoline & Oil
1,404.25
539
Seminar Fees
882.00
541
Seminars - Hotel/Motel
478.52
543
Seminar Meals & Tips
115.46
545
Seminar - Other Expenses
361.10
547
Samples to Customers
637.25
549
Sales Promotion
1,745.81
555
Sales Meeting Expense
399.10
557
Awards, Flowers, Gifts
702.05
561
Restaurant Expense
5,914.00
563
Film/Promotional
4,246.11
565
Bonus Paid
1,468.64
568
Professional Fees
6,420.00
35,354.33
*408 Petitioners Thomas P. and Sheila A. Poast began their Amway products distributorship in the fall of 1981, after being introduced to the activity by a coworker. At all material times, petitioners have been employed in full-time positions with the General Motors Corporation in Moraine, Ohio. Amway, a supplier of various products, uses a direct marketing concept to promote sales of its products. It is based on a "pyramid" incentive system whereby a distributor's increased sales are rewarded by bonus checks. In addition to selling retail to consumers, distributors can also increase their proceeds by recruiting others ("downliners") to sell the Amway products. If the recruit of one distributor recruited another downliner, the sales of the new downliner would also benefit the original distributor. The original Amway distributor is called an "upline" distributor in relation to a recruit who is called the "downline" distributor. If the upline distributor sells a product to a recruited downline distributor, that product is sold at cost. As time progressed, petitioners generally concentrated more on recruiting downliners and less on making retail sales to consumers. The potential *409 for profit from Amway on sales to downliners is from the volume sold. The upline distributor receives a percentage of the sales achieved by downliners in the chain of distribution. The greater the total volume of sales, the higher the percentage of sales or bonus the upliner realizes. Shortly before becoming involved with their Amway activity, petitioners attended a seminar conducted by an insurance agent, Donald Fletcher, who conducted similar seminars nationwide. Fletcher promoted his life insurance product, while suggesting to the participants of the seminars that the premiums be funded by tax savings generated by deducting largely personal expenses through a home based business like Amway. Fletcher offered to prepare participants' tax returns and provide representation in audits for a cost of $ 125. Petitioners became participants in Fletcher's tax/insurance program, and petitioners' income tax returns for taxable years 1981, 1982, and 1983 were prepared by Fletcher, his agents, or others utilizing the Fletcher program. After claiming losses and being audited by the Internal Revenue Service for those years, petitioners eventually joined a group of plaintiffs who sued Fletcher *410 and other defendants in Federal court. They won damages on the theory that Fletcher and others were involved in a racketeering scheme. In the instant case, petitioners admit that their tax returns for 1981, 1982, and 1983 were prepared incorrectly, although they deny that they overstated their Amway distributorship losses. Petitioners claim that they merely failed to substantiate their losses in 1981, 1982, and 1983, and that they tried harder in later years to substantiate their claimed expenses. Petitioners, to date, have reported net losses from their distributorship in every taxable year since 1981. In all the years including those at issue, 1986, and 1987, petitioners reported the following with respect to the Amway activity: Gross
Other
Gross
Net
Year
Receipts
Income Income [1]
Expenses
Loss
1981
$    953
-- $   (998)
$ 34,164
$ 35,162
1982
14,814
-- 3,196 27,793
24,597
1983
16,374
-- 5,550 29,810
24,260
1984
15,496
-- 3,598 36,976
33,378
1985
20,658
$ 3,441
9,101 42,612
33,511
1986
32,364
-- 7,286 32,345
[2] 225,059
1987
29,588
-- 927 26,138
[2] 225,211
TOTAL:
$ 130,247
$ 3,441
$ 28,660
$ 229,838
$ 201,178
*411 Petitioners claimed net losses from the Amway activity in subsequent years as follows: Year
Net Loss
1988
$ 36,028
1989
7,351
1990
44,669
1991
21,756
1992
19,834
Petitioners' income tax returns for taxable years 1986 and 1987 were prepared by Patrick Nally, C.P.A., who also prepared petitioners' returns for each of the years 1983 through 1989. Mr. Nally prepared the 1986 and 1987 returns using the receipts and documentation of expenses, which were given to him by petitioners. Petitioners kept a contemporaneous log of their alleged business activities and expenses on a daytime planner, stapling receipts to their calendar. Their log consisted of notes of personal activities, as well. Petitioners claim to have either discarded or otherwise separated out of their records all of their personal items before giving their books and records to Nally. After being notified that respondent would audit petitioners for their 1986 and 1987 returns, petitioners sought and hired a new accountant, James D. Umphrey, to whom they gave all their records so he could assist petitioners in the audit. Petitioners are convinced that Mr. Nally did an inadequate job, and they disavow their *412 1986 and 1987 returns in their entireties. Umphrey prepared a new accounting of the Amway activity, and petitioners filed their petition in this Court. Petitioners used Umphrey's accounting as a basis to argue that they actually understated their Amway losses. Respondent's amended answer raised the section 183 issue for the first time and accordingly alleged increased deficiencies and additions to tax, disallowing petitioners' claimed Amway losses in their entirety. As a result of the agreed figures reached by respondent and Mr. Umphrey, petitioners claimed at trial that they had net losses from Amway in 1986 and 1987 in the amounts of $ 27,635 and $ 31,835. Respondent does not agree that the claimed expenses are all Amway related and contends much of the claimed expense is personal in nature. Despite these claimed losses, petitioners claim that they had an expectation to make a profit in every year since 1982. During taxable years 1986 and 1987, petitioners worked considerable overtime at General Motors and they testified each worked 7 days a week at the GM plant. Petitioner Thomas P. Poast's [3] testimony was in direct conflict with his other testimony in which he alleged *413 that petitioners set up an Amway booth at Traders World (a weekend flea market) every Saturday and Sunday from 6 a.m. to 7 p.m. for 9 months during this period. We did not find petitioner's testimony credible. Still, petitioners spent a considerable amount of time on their Amway activity during the years at issue. At Trader's World, petitioners had some success making sales and recruiting downline distributors. Eventually, petitioners decided to abandon this effort, because they believed that there must have been better methods to operate their activity. Prior to abandoning this approach, however, petitioners did not conduct any kind of cost/benefit analysis to ascertain the potential profitability of this effort. Likewise, petitioners tried other techniques that were recommended to them by people who have had success in their Amway activity. Some stressed to petitioners that it was important to make as many contacts as possible in a day. Petitioners *414 tried to duplicate the techniques used by profitable distributors to expand their distributorship. They spent considerable time making efforts such as setting up a booth at a shopping mall and telemarketing to random names in the telephone book. Petitioners also advertised in local newspapers. Again, each of these techniques was abandoned by petitioners after having some success with them, without having first objectively assessed the profitability of the techniques by conducting some kind of cost/benefit analysis. The record is unclear as to how much time petitioners actually spent working on these techniques. Petitioners also spent considerable time and expense attending Amway-related activities, which had both social and business aspects to them. For instance, petitioners attended Amway seminars at a variety of locations across the United States and visited Amway corporate headquarters. During the years in issue, petitioners traveled to the District of Columbia, California, Texas, and Michigan. Petitioners hosted "potluck" meetings with upliners and downliners, where sales and recruiting were discussed and food and alcoholic beverages were served. During both years in *415 issue, petitioners made repeated trips to the Indianapolis Speedway, where they attended auto racing events and met the drivers of cars that Amway sponsored. Much of the time in Indianapolis was spent socializing with individuals affiliated with Amway. Petitioners deducted over $ 2,000 on this activity. Petitioners took many photographs at these events, using over $ 4,000 worth of photography equipment which they bought and deducted. Petitioners claim the pictures were later shown to recruits to help stimulate interest in the activity. Petitioners claimed the expenses from all of these activities as ordinary and necessary business expenses. Petitioners had two telephone lines in their home. One they classified as "business", the other as personal. Their "personal" telephone bills revealed no long-distance call charges. All such long-distance charges were on their "business" telephone, including calls to petitioner Sheila Poast's mother in England. Many meals deducted by petitioners as business had as their guest, Rose Poast, petitioner Thomas Poast's mother. They alleged she was a downliner, and they discussed business. Flowers and gifts for family members were deducted *416 as business related. Petitioners maintained daily daytimers in which they entered their daily activities. Although the testimony was that they attached receipts and records to the daytimer only for business expenses, many personal expenses were also included. Petitioners did not review the ledgers received from Mr. Nalley for purposes of determining how much they were making on sales to downliners. They did not make projections of sales activity, bonus payments, freight expenses, or automobile expenses. When they received their tax returns from their accountant, they did not review them, but simply signed them. OPINION It is well settled that deductions are matters of legislative grace, and petitioners bear the burden of proving entitlement to any deductions claimed on a return and of proving that respondent's determinations are erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). Respondent, however, bears the burden of proving that petitioners had deficiencies in amounts greater than those set forth in the notice of deficiency as claimed in her Amended Answer. Rule 142(a). Section 162 provides for deductions for ordinary and *417 necessary business expenses incurred in carrying on a trade or business. In her notice of deficiency, respondent determined that a portion of petitioners' claimed expenses were not ordinary and necessary, were not expended for the purpose designated, were not properly substantiated as required by section 274, or were otherwise not deductible as personal expenses. The section 1983 issue, however, supersedes the section 162 issues, because if petitioners did not carry on their Amway activity with the requisite profit objective, then petitioners' claimed Amway deductions are limited under section 183 and allowable only to the extent of the limitations of that section. Section 183. Respondent argues that petitioners' Amway distributorship was not an activity engaged in for profit within the meaning of section 183. Thus, respondent maintains that petitioners are not entitled to any loss from the distributorship. Ordinarily, the burden of proof is on the taxpayer to disprove respondent's determinations. In this case, however, respondent first raised the section 183 issue in her Amended Answer to the petition, in which she raised new matter and increased the asserted deficiency. *418 Thus, the burden of proving this issue rests with respondent. Rule 142(a). Generally, deductions are not allowable with respect to an activity not engaged in for profit. Secs. 162, 183(a), 212. Where there is no profit objective, section 183(b)(1) allows only those deductions which are allowable independent of profit motive (e.g., interest and taxes). To the extent that gross income from the activity exceeds the deductions allowable under section 183(b)(1), section 183(b)(2) allows all other deductions that would be allowable if there were a profit objective. The record, however, is clear that there is no such gross income. An activity not engaged in for profit "means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." Sec. 183(c). In order to deduct expenses of an activity under either section 162 or 212, the taxpayer must have engaged in the activity with an "actual and honest objective of making a profit." Dreicer v. Commissioner, 78 T.C. 642, 644-645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); *419 sec. 1.183-2(a), Income Tax Regs. It is not necessary that the expectation of profit be reasonable, but the profit objective must be bona fide, as judged by all the facts and circumstances. Taube v. Commissioner, 88 T.C. 464, 478-479 (1987); Fox v. Commissioner, 80 T.C. 972, 1006 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. sub nom. Barnard v. Commissioner, 731 F.2d 230 (4th Cir. 1984), affd. without published opinion sub nom. Hook v. Commissioner, Leffl v. Commissioner, Rosenblatt v. Commissioner, Zemel v. Commissioner, 734 F.2d 5, 6-7, 9 (3d Cir. 1984); Dreicer v. Commissioner, supra; sec. 1.183-2(a), Income Tax Regs. We give consideration to the nonexclusive list of factors set forth in section 1.183-2(b), Income Tax Regs.[4] No single factor is determinative of the issue. The issue is one of fact that must be resolved based on the facts and circumstances of each case, including factors not listed. Abramson v. Commissioner, 86 T.C. 360, 371 (1986); *420 sec. 1.183-2(b), Income Tax Regs. The taxpayer's stated intention to make a profit is not determinative; greater weight is given to objective factors rather than the taxpayer's mere statement of intent. Engdahl v. Commissioner, 72 T.C. 659, 666 (1979); sec. 1.183-2(a), Income Tax Regs.
Based on all the facts and circumstances, we find that respondent *421 has carried her burden of showing that petitioners lacked the requisite profit objective in carrying on the Amway activity. Petitioners conducted the activity in such a manner that the distributorship had virtually no possibility of recognizing a profit. Although petitioners argue that they conducted their activity in a businesslike manner in that they kept good records, sought expert counseling, utilized several different techniques, and devoted much time and effort to the distributorship, the record reflects that petitioners operated in an unbusinesslike manner, with little or no regard to the amount of expenses charged to the distributorship. Petitioners maintain that tax benefit was not an important consideration in starting and continuing in the Amway activity, but the record strongly suggests otherwise. It is true that petitioners kept copious records, but they did not utilize their records in a way to help them make a profit. Rather, petitioners appear to have believed that the only point in maintaining records was to help to substantiate claimed deductions from income for tax purposes. We find that petitioners did not use the records to keep abreast of the level of income *422 and expenses of the distributorship. Petitioners were unconcerned about what an analysis of their records would reflect, as the high level of the expenses in relation to their modest receipts stifled any potential for profit. Petitioners simply made the cash outlays and kept records of them and then instructed accountants to construct ledgers and prepare the tax returns. At trial, petitioners were not familiar with either the ledgers or the returns and admitted to not having looked at the returns prior to signing them. Even a cursory review of the ledgers would have displayed the fact that petitioners needed to drastically reduce their expenses in order to make a profit. Furthermore, our review of the sales records indicates that the records are incomplete. We are hard pressed to understand how, if petitioners kept accurate records, the distributorship could have yielded a negative gross profit in both years, when petitioners sold to downliners at cost, to customers at a mark-up, and never to anyone at a loss. Nothing in the record suggests that any theft, severe decline in the value of their inventory, or other inventory shrinkage occurred. It may be that petitioners used *423 some of the products themselves. We conclude that petitioners either failed to maintain adequate records of sales or that petitioners simply failed to record some sales. Petitioners argue that they sought advice from other distributors with more expertise and then abandoned ineffective techniques in favor of new ones. Before abandoning these techniques of operating booths at Trader's World and shopping malls, telemarketing, and newspaper advertising, however, petitioners did not attempt to perform even a crude cost/benefit analysis of these techniques. Considering the high losses sustained by the activity in previous years and the fact that petitioners often worked at their GM jobs 7 days a week, it should have been imperative for petitioners to be more analytical in determining the most effective way to spend their time and money. Petitioners appear to have drifted from one approach to the next without establishing some disciplined strategy to help them overcome their perennial losses. Petitioners claim that they sought the advice of experts and utilized their successful techniques. We find not only that the techniques were not seriously utilized, but also that, for the most *424 part, petitioners' advisers were not experts as much as they were upliners with a financial stake in petitioners' retail and downline sales. Neither petitioners nor their advisers appeared to be even vaguely interested in the importance of cutting back their expenses. Nothing in the record indicates that petitioners either sought or received any advice about how to curtail spending. Petitioners' high level of expenses was the chief obstacle to petitioners' ability to turn a profit, and it reflects that petitioners did not operate the activity in a businesslike manner. Petitioners argue that all of their expenses were necessary to build their distributorship so that the activity could earn a substantial profit in the future. We find, however, that petitioners exhibited little, if any, restraint in either incurring expenses in the first instance or in deciding to charge personal items to the activity. Petitioners had a propensity to be carried away with incurring alleged Amway expenses at a time when petitioners had already incurred substantial net losses in all prior years. Petitioners charged frequent trips to the Indianapolis Raceway to the distributorship. They purchased *425 thousands of dollars worth of camera equipment, allegedly so that they could photograph their Amway activities for marketing purposes. Petitioners charged the distributorship for many meals and flowers for petitioner Thomas Poast's mother, who was a downliner carrying only a modest sales volume. Petitioners claimed Amway deductions for an $ 800 balloon ride, as a sales promotion, dues to a welder's association, and membership in the Carlisle area Historical Society. Petitioners failed to isolate business expenses from personal expenses. Our conclusion is that this was not inadvertent. Petitioners seemed to believe that if they had an expense noted in their daytimer or other records, it became business in nature. We find petitioners were using their Amway activity in an attempt to shelter their personal living expenses. Petitioners totally eschewed such elementary business practices as preparing a realistic and reasonable budget or projecting the distributorship's profitability. When considering the fact that petitioners show negative gross proceeds for the taxable years and had no history of even occasional profits from the distributorship, petitioners had at best a reckless *426 attitude toward the finances of the activity. Although petitioners spent a good deal of time on the Amway activity, much of that time involved substantial pleasurable personal aspects. Although we believe petitioners spent time on such arduous activities as maintaining a booth at a flea market or a mall, petitioners also spent considerable time going on trips and dining, often with friends and relatives whose relationship to Amway was either remote or tenuous. In sum, although petitioners made an effort to maintain records to substantiate their expenses, respondent has shown that petitioners did not carry on their activity with a profit motive. Given the unbusinesslike way that petitioners chose to operate the activity, no reasonable expectation of earning a profit existed. Indeed, making a profit seemed to have been of minor importance to petitioners. Accordingly, although petitioners substantiated enough expenses as Amway related to cover any gross income received from the Amway activity, respondent is sustained on this issue, and petitioners are not entitled to deduct any losses from the distributorship in either year. As such, petitioners are not entitled to any refund. *427 Additions to tax for negligence. Respondent also determined in her notice of deficiency that petitioners are liable for additions to tax for negligence under section 6653(a)(1)(A) and (B). Respondent's determinations in the deficiency notice that petitioners' underpayments of tax were due to negligence or intentional disregard of rules or regulations is "presumptively correct and must stand unless the taxpayer can establish that he was not negligent." Hall v. Commissioner, 729 F.2d 632, 635 (9th Cir. 1984), affg. T.C. Memo. 1982-337. However, to the extent of the additions to tax on the increased deficiency set forth in the Amended Answer and at trial, respondent bears the burden of proof. Petitioners bear the burden of proving they are not liable for the additions to tax in the notice of deficiency. Rule 142(a); Bixby v. Commissioner, 58 T.C. 757, 791 (1972); Enoch v. Commissioner, 57 T.C. 781, 802 (1972). Negligence under section 6653(a) is lack of due care, or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. *428 Neely v. Commissioner, 85 T.C. 934, 947 (1985). In this case, petitioners admitted that they did not even look at their tax returns before signing them. Furthermore, petitioners have completely disavowed their returns for the years in issue, although they place the total blame for the faulty returns on their accountant. Whatever faults their preparer may have had, petitioners failed to isolate their personal records from their Amway records, and attempted to deduct many personal items. On this record, we conclude that petitioners were negligent within the meaning of section 6653(a) in their underpayments of tax. We further hold that respondent has shown conclusively that the entire underpayment in each year is due to negligence for purposes of section 6653(a)(1)(B). To give effect to the foregoing, Decision will be entered pursuant to Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
1. 50 percent of the interest due on $ 3,548 for 1986 and $ 3,038 for 1987.↩
1. 50 percent of the interest due on the total deficiencies.↩
2. Petitioners concede the nondeductibility of a capital loss, claimed on their 1987 income tax return, in the amount of $ 3,000. Respondent conceded at trial that personal property taxes paid would be deductible if the Court finds petitioners to be in a trade or business.↩
1. "Gross income" consists of receipts plus other income, i.e., bonuses, less cost of goods sold.↩
2. In their amended petition, petitioners claim additional net losses of $ 6,566 and $ 9,509 for 1986 and 1987, respectively.↩
3. References to petitioner in the singular are to Thomas P. Poast.↩
4. These are (1) the manner in which the taxpayer carried on the activity, (2) the expertise of the taxpayer or advisers, (3) the time and effort expended by the taxpayer in carrying on the activity, (4) the expectation that assets used in the activity may appreciate in value, (5) the success of the taxpayer in carrying on similar or dissimilar activities, (6) the taxpayer's history of income or losses with respect to the activity, (7) the amount of occasional profits, if any, which are earned from the activity, (8) the financial status of the taxpayer, and (9) the elements of personal pleasure or recreation derived from the activity.↩